LITTON FINANCIAL PRINTING DIVISION, A DIVISION OF LITTON BUSINESS SYSTEMS, INC. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 90–285.   Argued March 20, 1991—Decided June 13, 1991

192

*M. J. Diederich* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Wallace* argued the cause for the federal respondent in support of petitioner pursuant to this Court's Rule 12.4. With him on the briefs were *Solicitor General Starr, Michael R. Lazerwitz, Norton J. Come, Linda Sher,* and *David A. Fleischer. David A. Rosenfeld* argued the cause for the private respondent. With him on the brief were *Victor J. Van Bourg, Marsha S. Berzon, Steven J. Kaplan,* and *Laurence Gold.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to determine whether a dispute over layoffs which occurred well after expiration of a collective-bargaining agreement must be said to arise under the agreement despite its expiration. The question arises in the context of charges brought by the National Labor Relations Board (Board), alleging an unfair labor practice in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. §§ 158(a)(1) and (5). We interpret our earlier decision in *Nolde Brothers, Inc.* v. *Bakery Workers,* 430 U. S. 243 (1977).

## I

Petitioner Litton operated a check printing plant in Santa Clara, California. The plant utilized both coldtype and hot-type printing processes. Printing Specialties & Paper Products Union No. 777, Affiliated With District Council No. 1 (Union), represented the production employees at the plant. The Union and Litton entered into a collective-bargaining agreement (Agreement) which, with extensions, remained in effect until October 3, 1979. Section 19 of the Agreement is a broad arbitration provision:

---

*John S. Irving* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

"Differences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, the construction to be placed on any clause or clauses of the Agreement shall be determined by arbitration in the manner hereinafter set forth." App. 34.

Section 21 of the Agreement sets forth a two-step grievance procedure, at the conclusion of which, if a grievance cannot be resolved, the matter may be submitted for binding arbitration. *Id.*, at 35.

Soon before the Agreement was to expire, an employee sought decertification of the Union. The Board conducted an election on August 17, 1979, in which the Union prevailed by a vote of 28 to 27. On July 2, 1980, after much postelection legal maneuvering, the Board issued a decision to certify the Union. No contract negotiations occurred during this period of uncertainty over the Union's status.

Litton decided to test the Board's certification decision by refusing to bargain with the Union. The Board rejected Litton's position and found its refusal to bargain an unfair labor practice. *Litton Financial Printing Division*, 256 N. L. R. B. 516 (1981). Meanwhile, Litton had decided to eliminate its coldtype operation at the plant, and in late August and early September 1980, laid off 10 of the 42 persons working in the plant at that time. The laid off employees worked either primarily or exclusively with the coldtype operation, and included 6 of the 11 most senior employees in the plant. The layoffs occurred without any notice to the Union.

The Union filed identical grievances on behalf of each laid off employee, claiming a violation of the Agreement, which had provided that "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal." App. 30. Litton refused to submit to the grievance and arbitration procedure or to negotiate over the decision to lay off the employees, and took a position later interpreted by the Board as a refusal to arbi-

trate under any and all circumstances. It offered instead to negotiate concerning the effects of the layoffs.

On November 24, 1980, the General Counsel for the Board issued a complaint alleging that Litton's refusal to process the grievances amounted to an unfair labor practice within the meaning of §§ 8(a)(1) and (5) of the NLRA, 29 U. S. C. §§ 158(a)(1) and (5). App. 15. On September 4, 1981, an Administrative Law Judge found that Litton had violated the NLRA by failing to process the grievances. Id., at 114–115. Relying upon the Board's decision in American Sink Top & Cabinet Co., 242 N. L. R. B. 408 (1979), the Administrative Law Judge went on to state that if the grievances remained unresolved at the conclusion of the grievance process, Litton could not refuse to submit them to arbitration. App. 115–118. The Administrative Law Judge held also that Litton violated §§ 8(a)(1) and (5) when it bypassed the Union and paid severance wages directly to the 10 laid off employees, and Litton did not contest that determination in further proceedings.

Over six years later, the Board affirmed in part and reversed in part the decision of the Administrative Law Judge. 286 N. L. R. B. 817 (1987). The Board found that Litton had a duty to bargain over the layoffs and violated § 8(a) by failing to do so. Based upon well-recognized Board precedent that the unilateral abandonment of a contractual grievance procedure upon expiration of the contract violates §§ 8(a)(1) and (5), the Board held that Litton had improperly refused to process the layoff grievances. See Bethlehem Steel Co., 136 N. L. R. B. 1500, 1503 (1962), enforced in pertinent part, 320 F. 2d 615 (CA3 1963). The Board proceeded to apply its recent decision in Indiana & Michigan Electric Co., 284 N. L. R. B. 53 (1987), which contains the Board's current understanding of the principles of postexpiration arbitrability and of our opinion in Nolde Brothers, Inc. v. Bakery Workers, supra. The Board held that Litton's "wholesale repudiation" of its obligation to arbitrate any contractual grievance

after the expiration of the Agreement also violated §§ 8(a)(1) and (5), as the Agreement's broad arbitration clause lacked

"language sufficient to overcome the presumption that the obligation to arbitrate imposed by the contract extended to disputes arising under the contract and occurring after the contract had expired. Thus, [Litton] remained 'subject to a potentially viable contractual commitment to arbitrate even after the [Agreement] expired.'" 286 N. L. R. B., at 818 (citation omitted).

Litton did not seek review of, and we do not address here, the Board's determination that Litton committed an unfair labor practice by its unilateral abandonment of the grievance process and wholesale repudiation of any postexpiration obligation to arbitrate disputes.

In fashioning a remedy, the Board went on to consider the arbitrability of these particular layoff grievances. Following *Indiana & Michigan*, the Board declared its determination to order arbitration "only when the grievances at issue 'arise under' the expired contract." 286 N. L. R. B., at 821 (citing *Nolde Brothers, Inc.* v. *Bakery Workers*, 430 U. S. 243 (1977)). In finding that the dispute about layoffs was outside this category, the Board reasoned as follows:

"The conduct that triggered the grievances . . . occurred after the contract had expired. The right to layoff by seniority if other factors such as ability and experience are equal is not 'a right worked for or accumulated over time.' *Indiana & Michigan, supra* at 61. And, as in *Indiana & Michigan Electric*, there is no indication here that 'the parties contemplated that such rights could ripen or remain enforceable even after the contract expired.' *Id.* (citation omitted). Therefore, [Litton] had no contractual obligation to arbitrate the grievances." 286 N. L. R. B., at 821–822.

Although the Board refused to order arbitration, it did order Litton to process the grievances through the two-step griev-

ance procedure, to bargain with the Union over the layoffs, and to provide a limited backpay remedy.

The Board sought enforcement of its order, and both the Union and Litton petitioned for review. The Court of Appeals enforced the Board's order, with the exception of that portion holding the layoff grievances not arbitrable. 893 F. 2d 1128 (CA9 1990). On that question, the Court of Appeals was willing to "assume without deciding that the Board's *Indiana & Michigan* decision is a reasonably defensible construction of the section 8(a)(5) duty to bargain." *Id.*, at 1137. The court decided, nevertheless, that the Board had erred, because the right in question, the right to layoff in order of seniority if other things such as aptitude and ability are equal, did arise under the Agreement. The Court of Appeals thought the Board's contrary conclusion was in conflict with two later Board decisions, where the Board had recognized that seniority rights may arise under an expired contract, *United Chrome Products, Inc.*, 288 N. L. R. B. 1176 (1988), and *Uppco, Inc.*, 288 N. L. R. B. 937 (1988).

The court cited a second conflict, one between *Indiana & Michigan* and the court's own interpretation of *Nolde Bros.* in *Local Joint Executive Bd. of Las Vegas Culinary Workers Union, Local 226* v. *Royal Center, Inc.*, 796 F. 2d 1159 (CA9 1986). In *Royal Center*, the Court of Appeals had rejected the argument that only rights accruing or vesting under a contract prior to termination are covered by the posttermination duty to arbitrate. *Id.*, at 1163.

Litton petitioned for a writ of certiorari. Because of substantial disagreement as to the proper application of our decision in *Nolde Brothers*,[1] we granted review limited to the

---

[1] The conflict between the Ninth Circuit's reasoning in *Local Joint Executive Bd. of Las Vegas Culinary Workers Union, Local 226* v. *Royal Center, Inc.*, 796 F. 2d 1159 (1986), and the Board's approach in *Indiana & Michigan Electric Co.*, 284 N. L. R. B. 53 (1987), reflects a wider split of authority. The Third and Fifth Circuits follow an approach similar to that of the Ninth Circuit. See *Federated Metals Corp.* v. *United Steelworkers*

question of arbitrability of the layoff grievances.    498 U. S. 966 (1990).

## II

### A

Sections 8(a)(5) and 8(d) of the NLRA, 29 U. S. C. §§ 158(a) (5) and (d), require an employer to bargain "in good faith with respect to wages, hours, and other terms and conditions of employment."    The Board has taken the position that it is difficult to bargain if, during negotiations, an employer is free to alter the very terms and conditions that are the subject of those negotiations.    The Board has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment. See *NLRB* v. *Katz,* 369 U. S. 736 (1962).    In *Katz* the union was newly certified and the parties had yet to reach an initial agreement.    The *Katz* doctrine has been extended as well to cases where, as here, an existing agreement has expired and negotiations on a new one have yet to be completed.    See, *e. g., Laborers Health and Welfare Trust Fund* v. *Advanced Lightweight Concrete Co.,* 484 U. S. 539, 544, n. 6 (1988).

---

*of America,* 648 F. 2d 856, 861 (CA3), cert. denied, 454 U. S. 1031 (1981); *Seafarers Int'l Union of North America* v. *National Marine Servs., Inc.,* 820 F. 2d 148, 152–154 (CA5), cert. denied, 484 U. S. 953 (1987).    The Eighth Circuit, Tenth Circuit, and the Michigan Supreme Court follow the Board's approach and limit the presumption of postexpiration arbitrability to rights that accrued or vested under the agreement, or events that took place prior to expiration of the agreement.    See *Chauffeurs, Teamsters and Helpers, Local Union 238* v. *C. R. S. T. Inc.,* 795 F. 2d 1400, 1404 (CA8 1986) (en banc); *United Food & Commercial Workers Int'l Union, AFL–CIO, Local 7* v. *Gold Star Sausage Co.,* 897 F. 2d 1022, 1025–1026 (CA10 1990); *County of Ottawa* v. *Jaklinski,* 423 Mich. 1, 377 N. W. 2d 668 (1985) (discussing *Nolde* in context of Michigan law applicable to public employers).    The Seventh Circuit, finally, restricts application of *Nolde Brothers* to a limited period following expiration of a bargaining agreement.    See *Local 703, Int'l Brotherhood of Teamsters* v. *Kennicott Bros. Co.,* 771 F. 2d 300 (1985).

Numerous terms and conditions of employment have been held to be the subject of mandatory bargaining under the NLRA. See generally 1 C. Morris, The Developing Labor Law 772–844 (2d ed. 1983). Litton does not question that arrangements for arbitration of disputes are a term or condition of employment and a mandatory subject of bargaining. See *id.*, at 813 (citing cases); *United States Gypsum Co.*, 94 N. L. R. B. 112, 131 (1951).

The Board has ruled that most mandatory subjects of bargaining are within the *Katz* prohibition on unilateral changes. The Board has identified some terms and conditions of employment, however, which do not survive expiration of an agreement for purposes of this statutory policy. For instance, it is the Board's view that union security and dues check-off provisions are excluded from the unilateral change doctrine because of statutory provisions which permit these obligations only when specified by the express terms of a collective-bargaining agreement. See 29 U. S. C. § 158(a)(3) (union security conditioned upon agreement of the parties); § 186(c)(4) (dues check-off valid only until termination date of agreement); *Indiana & Michigan*, 284 N. L. R. B., at 55 (quoting *Bethlehem Steel*, 136 N. L. R. B., at 1502). Also, in recognition of the statutory right to strike, no-strike clauses are excluded from the unilateral change doctrine, except to the extent other dispute resolution methods survive expiration of the agreement. See 29 U. S. C. §§ 158(d)(4), 163 (union's statutory right to strike); *Southwestern Steel & Supply, Inc.* v. *NLRB*, 257 U. S. App. D. C. 19, 23, 806 F. 2d 1111, 1114 (1986).

In *Hilton-Davis Chemical Co.*, 185 N. L. R. B. 241 (1970), the Board determined that arbitration clauses are excluded from the prohibition on unilateral changes, reasoning that the commitment to arbitrate is a "voluntary surrender of the right of final decision which Congress . . . reserved to [the] parties. . . . [A]rbitration is, at bottom, a consensual surrender of the economic power which the parties are other-

wise free to utilize." *Id.*, at 242. The Board further relied upon our statements acknowledging the basic federal labor policy that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582 (1960). See also 29 U. S. C. § 173(d) (phrased in terms of parties' agreed-upon method of dispute resolution under an *existing* bargaining agreement). Since *Hilton-Davis*, the Board has adhered to the view that an arbitration clause does not, by operation of the NLRA as interpreted in *Katz*, continue in effect after expiration of a collective-bargaining agreement.

## B

The Union argues that we should reject the Board's decision in *Hilton-Davis Chemical Co.*, and instead hold that arbitration provisions are within *Katz'* prohibition on unilateral changes. The unilateral change doctrine, and the exclusion of arbitration from the scope of that doctrine, represent the Board's interpretation of the NLRA requirement that parties bargain in good faith. And "[i]f the Board adopts a rule that is rational and consistent with the Act . . . then the rule is entitled to deference from the courts." *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 42 (1987); see, *e. g.*, *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 786–787 (1990).

We think the Board's decision in *Hilton-Davis Chemical Co.* is both rational and consistent with the Act. The rule is grounded in the strong statutory principle, found in both the language of the NLRA and its drafting history, of consensual rather than compulsory arbitration. See *Indiana & Michigan, supra,* at 57–58; *Hilton-Davis Chemical Co., supra.* The rule conforms with our statement that "[n]o obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway*

*Coal Co.* v. *Mine Workers,* 414 U. S. 368, 374 (1974). We reaffirm today that under the NLRA arbitration is a matter of consent, and that it will not be imposed upon parties beyond the scope of their agreement.

In the absence of a binding method for resolution of postexpiration disputes, a party may be relegated to filing unfair labor practice charges with the Board if it believes that its counterpart has implemented a unilateral change in violation of the NLRA. If, as the Union urges, parties who favor labor arbitration during the term of a contract also desire it to resolve postexpiration disputes, the parties can consent to that arrangement by explicit agreement. Further, a collective-bargaining agreement might be drafted so as to eliminate any hiatus between expiration of the old and execution of the new agreement, or to remain in effect until the parties bargain to impasse.[2] Unlike the Union's suggestion that we impose arbitration of postexpiration disputes upon parties once they agree to arbitrate disputes arising under a contract, these alternatives would reinforce the statutory policy that arbitration is not compulsory.

## III

The Board argues that it is entitled to substantial deference here because it has determined the remedy for an unfair labor practice. As noted above, we will uphold the Board's interpretation of the NLRA so long as it is "rational and consistent with the Act." *Fall River Dyeing & Finishing Corp.* v. *NLRB, supra,* at 42. And we give the greatest latitude to the Board when its decision reflects its "'difficult

---

[2] See, *e. g., NLRB* v. *New England Newspapers, Inc.,* 856 F. 2d 409, 410 (CA1 1988) (agreement would continue in effect until a new agreement was reached); *Montgomery Mailers' Union No. 127* v. *The Advertiser Co.,* 827 F. 2d 709, 712, n. 5 (CA11 1987) (agreement to continue in effect "for a reasonable time for negotiation of a new agreement"); *Teamsters Local Union 688* v. *John J. Meier Co.,* 718 F. 2d 286, 287 (CA8 1983) ("[A]ll terms and provisions of the expired agreement shall continue in effect until a new agreement is adopted or negotiations are terminated").

and delicate responsibility' of reconciling conflicting interests of labor and management," *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 267 (1975). We have accorded the Board considerable authority to structure its remedial orders to effect the purposes of the NLRA and to order the relief it deems appropriate. See *Shepard* v. *NLRB*, 459 U. S. 344, 352 (1983); *Virginia Electric & Power Co.* v. *NLRB*, 319 U. S. 533, 540 (1943).

The portion of the Board's decision which we review today does discuss the appropriate remedy for a violation of the NLRA. But it does not follow that we must accord the same deference we recognized in *Virginia Electric & Power Co.* and *Shepard*. Here, the Board's remedial discussion is not grounded in terms of any need to arbitrate these grievances in order "to effectuate the policies of the Act." *Virginia Electric & Power Co., supra*, at 540. Rather, the Board's decision not to order arbitration of the layoff grievances rests upon its interpretation of the Agreement, applying our decision in *Nolde Brothers* and the federal common law of collective-bargaining agreements. The Board now defends its decision on the ground that it need not "reflexively order that which a complaining party may regard as 'complete relief' for every unfair labor practice," *Shepard* v. *NLRB, supra*, at 352; but its decision did not purport to rest upon such grounds.

Although the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, see *NLRB* v. *C & C Plywood Corp.*, 385 U. S. 421 (1967), the Board is neither the sole nor the primary source of authority in such matters. "Arbitrators and courts are still the principal sources of contract interpretation." *NLRB* v. *Strong*, 393 U. S. 357, 360–361 (1969). Section 301 of the Labor Management Relations Act, 1947 (LMRA), 29 U. S. C. § 185, "authorizes *federal courts* to fashion a body of federal law for the enforcement of . . . collective bargaining agreements." *Textile Workers* v. *Lincoln Mills*

*of Alabama*, 353 U. S. 448, 451 (1957) (emphasis added). We would risk the development of conflicting principles were we to defer to the Board in its interpretation of the contract, as distinct from its devising a remedy for the unfair labor practice that follows from a breach of contract. We cannot accord deference in contract interpretation here only to revert to our independent interpretation of collective-bargaining agreements in a case arising under § 301. See *Local Union 1395, Int'l Brotherhood of Electrical Workers* v. *NLRB*, 254 U. S. App. D. C. 360, 363–364, 797 F. 2d 1027, 1030–1031 (1986).

## IV

The duty not to effect unilateral changes in most terms and conditions of employment, derived from the statutory command to bargain in good faith, is not the sole source of possible constraints upon the employer after the expiration date of a collective-bargaining agreement. A similar duty may arise as well from the express or implied terms of the expired agreement itself. This, not the provisions of the NLRA, was the source of the obligation which controlled our decision in *Nolde Brothers, Inc.* v. *Bakery Workers*, 430 U. S. 243 (1977). We now discuss that precedent in the context of the case before us.

In *Nolde Brothers*, a union brought suit under § 301 of the LMRA, 29 U. S. C. § 185, to compel arbitration. Four days after termination of a collective-bargaining agreement, the employer decided to cease operations. The employer settled employee wage claims, but refused to pay severance wages called for in the agreement, and declined to arbitrate the resulting dispute. The union argued that these wages

"were in the nature of 'accrued' or 'vested' rights, earned by employees during the term of the contract on essentially the same basis as vacation pay, but payable only upon termination of employment." *Nolde Brothers*, 430 U. S., at 248.

We agreed that

> "whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given the contract clause providing for severance pay. The dispute therefore, although arising *after* the expiration of the collective-bargaining contract, clearly arises *under* that contract." *Id.*, at 249 (emphasis in original).

We acknowledged that "the arbitration duty is a creature of the collective-bargaining agreement" and that the matter of arbitrability must be determined by reference to the agreement, rather than by compulsion of law. *Id.*, at 250–251. With this understanding, we held that the extensive obligation to arbitrate under the contract in question was not consistent with an interpretation that would eliminate all duty to arbitrate as of the date of expiration. That argument, we noted,

> "would preclude the entry of a post-contract arbitration order even when the dispute arose during the life of the contract but arbitration proceedings had not begun before termination. The same would be true if arbitration processes began but were not completed, during the contract's term." *Id.*, at 251.

We found "strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract," *id.*, at 253, and noted that "the parties' failure to exclude from arbitrability contract disputes arising after termination . . . affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship," *id.*, at 255. We found a presumption in favor of postexpiration arbitration of matters unless "negated expressly or by clear implication," *ibid.*, but that conclusion was limited by the vital qualification that arbitration was of matters and disputes arising out of the relation governed by contract.

## A

Litton argues that provisions contained in the Agreement rebut the *Nolde Brothers* presumption that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration.  The Agreement provides that its stipulations "shall be in effect for the time hereinafter specified," App. 22, in other words, until the date of expiration and no longer. The Agreement's no-strike clause, which Litton characterizes as a *quid pro quo* for arbitration, applies only "during the term of this [a]greement," *id.*, at 34.  Finally, the Agreement provides for "interest arbitration" in case the parties are unable to conclude a successor agreement, *id.*, at 53–55, proving that where the parties wished for arbitration other than to resolve disputes as to contract interpretation, they knew how to draft such a clause.  These arguments cannot prevail.  The Agreement's unlimited arbitration clause, by which the parties agreed to arbitrate all "[d]ifferences that may arise between the parties" regarding the Agreement, violations thereof, or "the construction to be placed on any clause or clauses of the Agreement," *id.*, at 34, places it within the precise rationale of *Nolde Brothers*.  It follows that if a dispute arises under the contract here in question, it is subject to arbitration even in the postcontract period.

## B

With these matters resolved, we come to the crux of our inquiry.  We agree with the approach of the Board and those courts which have interpreted *Nolde Brothers* to apply only where a dispute has its real source in the contract.  The object of an arbitration clause is to implement a contract, not to transcend it.  *Nolde Brothers* does not announce a rule that postexpiration grievances concerning terms and conditions of employment remain arbitrable.  A rule of that sweep in fact would contradict the rationale of *Nolde Brothers*. The *Nolde Brothers* presumption is limited to disputes arising under the contract.  A postexpiration grievance can be

said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

Any other reading of *Nolde Brothers* seems to assume that postexpiration terms and conditions of employment which coincide with the contractual terms can be said to arise under an expired contract, merely because the contract would have applied to those matters had it not expired. But that interpretation fails to recognize that an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied. Although after expiration most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bargain, those terms and conditions no longer have force by virtue of the contract. See *Office and Professional Employees Ins. Trust Fund* v. *Laborers Funds Administrative Office of Northern California, Inc.*, 783 F. 2d 919, 922 (CA9 1986) ("An expired [collective-bargaining agreement] . . . is no longer a 'legally enforceable document'" (citation omitted)); cf. *Derrico* v. *Sheehan Emergency Hosp.*, 844 F. 2d 22, 25–27 (CA2 1988) (Section 301 of the LMRA, 29 U. S. C. § 185, does not provide for federal court jurisdiction where a bargaining agreement has expired, although rights and duties under the expired agreement "retain legal significance because they define the *status quo*" for purposes of the prohibition on unilateral changes).

The difference is as elemental as that between *Nolde Brothers* and *Katz.* Under *Katz,* terms and conditions continue in effect by operation of the NLRA. They are no longer agreed-upon terms; they are terms imposed by law, at least so far as there is no unilateral right to change them. As the Union acknowledges, the obligation not to make uni-

lateral changes is "rooted not in the contract but in preservation of existing terms and conditions of employment and applies before any contract has been negotiated." Brief for Respondent Union 34, n. 21. *Katz* illustrates this point with utter clarity, for in *Katz* the employer was barred from imposing unilateral changes even though the parties had yet to execute their first collective-bargaining agreement.

Our decision in *Laborers Health and Welfare Trust Fund* v. *Advanced Lightweight Concrete Co.*, 484 U. S. 539 (1988), further demonstrates the distinction between contractual obligations and postexpiration terms imposed by the NLRA. There, a bargaining agreement required employer contributions to a pension fund. We assumed that under *Katz* the employer's failure to continue contributions after expiration of the agreement could constitute an unfair labor practice, and if so the Board could enforce the obligation. We rejected, however, the contention that such a failure amounted to a violation of the ERISA obligation to make contributions "under the terms of a collectively bargained agreement . . . in accordance with the terms and conditions of . . . such agreement." 29 U. S. C. § 1145. Any postexpiration obligation to contribute was imposed by the NLRA, not by the bargaining agreement, and so the District Court lacked jurisdiction under § 502(g)(2) of ERISA, 29 U. S. C. § 1132(g)(2), to enforce the obligation.

As with the obligation to make pension contributions in *Advanced Lightweight Concrete Co.*, other contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement. Exceptions are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement. And of course, if a collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitra-

tion provisions. See *United Steelworkers of America* v. *Fort Pitt Steel Casting, Division of Conval-Penn, Inc.*, 598 F. 2d 1273 (CA3 1979) (agreement provided for continuing medical benefits in the event of postexpiration labor dispute).

Finally, as we found in *Nolde Brothers*, structural provisions relating to remedies and dispute resolution—for example, an arbitration provision—may in some cases survive in order to enforce duties arising under the contract. *Nolde Brothers'* statement to that effect under § 301 of the LMRA is similar to the rule of contract interpretation which might apply to arbitration provisions of other commercial contracts.[3] We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement.

C

The Union, and JUSTICE STEVENS' dissent, argue that we err in reaching the merits of the issue whether the post-termination grievances arise under the expired agreement because, it is said, that is an issue of contract interpretation to be submitted to an arbitrator in the first instance. Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to "arbitrate the arbitrability question." *AT&T Technologies, Inc.* v.

---

[3] See, *e. g.*, *West Virginia ex rel. Ranger Fuel Corp.* v. *Lilly*, 165 W. Va. 98, 100–101, 267 S. E. 2d 435, 437–438 (W. Va. 1980) (duty to arbitrate survives termination of lease); *Warren Brothers Co.* v. *Cardi Corp.*, 471 F. 2d 1304 (CA1 1973) (arbitration clause survives completion of work under construction contract); *Mendez* v. *Trustees of Boston University*, 362 Mass. 353, 356, 285 N. E. 2d 446, 448 (1972) (termination of employment contract "does not necessarily terminate a provision for arbitration or other agreed procedure for the resolution of disputes"); *The Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 10–11, 110 A. 2d 464, 469–470 (1954) (arbitration clause in building contract not affected by a party's repudiation or total breach of contract).

*Communications Workers*, 475 U. S. 643, 651 (1986). We acknowledge that where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.*, at 650 (quoting *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582–583 (1960)). But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate. Although "'[d]oubts should be resolved in favor of coverage,'" *AT&T Technologies, supra,* at 650, we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement.

We apply these principles to the layoff grievances in the present case. The layoffs took place almost one year after the Agreement had expired. It follows that the grievances are arbitrable only if they involve rights which accrued or vested under the Agreement, or rights which carried over after expiration of the Agreement, not as legally imposed terms and conditions of employment but as continuing obligations under the contract.

The contractual right at issue, that "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal," App. 30, involves a residual element of seniority. Seniority provisions, the Union argues, "create a form of earned advantage, accumulated over time, that can be understood as a special form of deferred compensation for time already worked." Brief for Respondent Union 23–25, n. 14. Leaving aside the

question whether a provision requiring all layoffs to proceed in inverse order of seniority would support an analogy to the severance pay at issue in *Nolde Brothers*, which was viewed as a form of deferred compensation, the layoff provision here cannot be so construed, and cannot be said to create a right that vested or accrued during the term of the Agreement or a contractual obligation that carries over after expiration.

The order of layoffs under the Agreement was to be determined primarily with reference to "other factors such as aptitude and ability." Only where all such factors were equal was the employer required to look to seniority. Here, any arbitration proceeding would of necessity focus upon whether aptitude and ability—and any unenumerated "other factors"—were equal long after the Agreement had expired, as of the date of the decision to lay off employees and in light of Litton's decision to close down its coldtype printing operation.

The important point is that factors such as aptitude and ability do not remain constant, but change over time. They cannot be said to vest or accrue or be understood as a form of deferred compensation. Specific aptitudes and abilities can either improve or atrophy. And the importance of any particular skill in this equation varies with the requirements of the employer's business at any given time. Aptitude and ability cannot be measured on some universal scale, but only by matching an employee to the requirements of an employer's business at that time. We cannot infer an intent on the part of the contracting parties to freeze any particular order of layoff or vest any contractual right as of the Agreement's expiration.[4]

---

[4] Although our decision that the dispute does not arise under the Agreement does, of necessity, determine that as of August 1980 the employees lacked any vested contractual right to a particular order of layoff, the Union would remain able to argue that the failure to lay off in inverse order of seniority if "other things such as aptitude and ability" were equal amounted to an unfair labor practice, as a unilateral change of a term or

## V

For the reasons stated, we reverse the judgment of the Court of Appeals to the extent that the Court of Appeals refused to enforce the Board's order in its entirety and remanded the cause for further proceedings.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN and JUSTICE SCALIA join, dissenting.

Although I agree with JUSTICE STEVENS' dissent, *post*, I write separately to emphasize the majority's mischaracterization of our decision in *Nolde Bros., Inc.* v. *Bakery Workers*, 430 U. S. 243 (1977). *Nolde* states a broad, rebuttable presumption of arbitrability which applies to *all* posttermination disputes arising under the expired agreement; it leaves the merits of the underlying dispute to be determined by the arbitrator. Today the majority turns *Nolde* on its head, announcing a rule that requires courts to reach the merits of the underlying posttermination dispute in order to determine whether it should be submitted to arbitration. This result is not only unfaithful to precedent but also it is inconsistent with sound labor-law policy.

## I

The dispute in *Nolde* concerned whether employees terminated after the expiration of a collective-bargaining agreement were entitled to severance pay under a severance-pay clause of the expired agreement. See *id.*, at 248–249. The Court stated that the severance-pay dispute "hinge[d] on the interpretation [of] the contract clause providing for severance pay" but that "the merits of the underlying claim" were not implicated "in determining the arbitrability of the dispute." *Id.*, at 249. To determine whether the dispute was

---

condition of employment. We do not decide whether, in fact, the layoffs were out of order.

arbitrable, the Court looked solely to the expired agreement's *arbitration* clause. It found the severance-pay dispute arbitrable because "[t]he parties agreed to resolve *all* disputes by resort to the mandatory grievance-arbitration machinery" and "nothing in the arbitration clause . . . expressly exclude[d] from its operation a dispute which arises under the contract, but which is based on events that occur after its termination." *Id.*, at 252–253.[1] Thus, under *Nolde*, the key questions for determining arbitrability are whether (1) the dispute is "based on . . . differing perceptions of a provision of the expired collective-bargaining agreement" or otherwise "arises under that contract," *id.*, at 249 (emphasis omitted), and, if so, (2) whether the "presumptions favoring" arbitrability have been "negated expressly or by clear implication," *id.*, at 255.

The majority grossly distorts *Nolde*'s test for arbitrability by transforming the first requirement that posttermination disputes "arise under" the expired contract. The *Nolde* Court defined "arises under" by reference to the *allegations* in the grievance. In other words, a dispute "arises under" the agreement where "the resolution of [the Union's] claim hinges on the interpretation ultimately given the contract." *Id.*, at 249.

By contrast, the majority today holds that a postexpiration grievance can be said to "arise under" the agreement only where the court satisfies itself (1) that the challenged action "infringes a right that accrued or vested under the agreement," or (2) that "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Ante*, at 206. Because they involve inquiry into the substantive effect of the terms of the agreement, these determinations require passing upon the merits of the underlying dispute. Yet the *Nolde* Court

---

[1] I agree with the majority that the National Labor Relations Board's (Board) determination as to arbitrability under the contract is not entitled to deference. See *ante*, at 202–203.

expressly stated that "in determining the arbitrability of the dispute, the merits of the underlying claim . . . are not before us." 430 U. S., at 249.

Since the proper question under *Nolde* is whether the dispute in this case "arises under" the agreement in the sense that it is "based on . . . differing perceptions of a provision of the expired collective-bargaining agreement," *ibid.*, I have no difficulty concluding that this test is met here. The Union's grievance "claim[ed] a violation of the Agreement," *ante*, at 194, by petitioner's layoffs. And, as even the majority concedes, "[t]he Agreement's unlimited arbitration clause" encompasses any dispute that "arises under the contract here in question." *Ante*, at 205. Thus, the dispute is arbitrable because the "presumptions favoring" arbitrability have not been "negated expressly or by clear implication." 430 U. S., at 255.

In fashioning its more rigorous standard for arbitrability, the majority erroneously suggests that if *Nolde* rendered arbitrable *all* postexpiration disputes about an expired agreement's substantive provisions, it would have the effect of extending the life of the entire contract beyond the date of expiration. See *ante*, at 206. The defect in this view is that it equates *asking* an arbitrator to determine whether a particular contractual provision creates rights that survive expiration with a decision that the provision *does* create such postexpiration rights. The majority evidently fears that arbitrators cannot be trusted to decide the issue correctly. Yet arbitrators typically have more expertise than courts in construing collective-bargaining agreements, and our arbitration jurisprudence makes clear that courts must rely on arbitral judgments where the parties have agreed to do so. Thus in *Nolde*, we carefully avoided expressing any view as to whether the substantive provisions of the expired agreement had any posttermination effect precisely because the parties had expressed their preference for an arbitral, rather

than a judicial interpretation. See *Nolde, supra,* at 249, 253.

Consequently, the issue here, as it was in *Nolde,* is not whether a substantive provision of the expired collective-bargaining agreement (in this case the provision covering lay-offs) remains enforceable but whether the expired agreement reflects the parties' intent to *arbitrate* the Union's contention that this provision remains enforceable. The majority itself acknowledges a general rule of contract construction by which arbitration or other dispute resolution provisions may survive the termination of a contract. *Ante,* at 208, and n. 3. That is all *Nolde* stands for.[2]

In addition to being without legal foundation, the majority's displacement of *Nolde*'s simple, interpretive presumption with a case-by-case test is unsound from a policy standpoint. Ironically, whereas parties that have agreed to a broad arbitration clause have expressed a preference for "a prompt and inexpensive resolution of their disputes by an expert tribunal," *Nolde, supra,* at 254, the majority invites protracted litigation about what rights may "accrue" or "vest" under the contract—litigation aimed solely at determining whether the dispute will be resolved by arbitration. More fundamentally, because the arbitrator is better equipped than are judges to make the often difficult determination of

---

[2] The majority "presume[s] 'as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." *Ante,* at 208. But the arbitration clause of the expired collective-bargaining agreement does not distinguish among types of disputes that the parties would and would not submit to arbitration. As in *Nolde,* the parties agreed to submit *all* disputes arising under the agreement to arbitration. By looking to the terms of the agreement's layoff provision to draw a conclusion about whether the parties intended rights under that provision to survive termination, the majority is deciding the merits of the dispute rather than the issue of its arbitrability. Notably, the layoff provisions do not contain any language suggesting an intent to preclude posttermination grievances over layoffs from arbitration. See App. 30–31.

the post-termination effect of an expired contract's substantive provisions, the majority's assignment of this task to courts increases the likelihood of error. See *id.*, at 253 ("'The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed,'" quoting *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 582 (1960)).

## II

The majority's resolution of the merits of the contract dispute here reinforces my conviction that arbitrators should be the preferred resolvers of such questions. The Union based its grievance on the following provision of the contract: "[I]n case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal." App. 30. The Union's contention that postexpiration layoffs violated this provision rests on the assertion that this contractual provision created rights that survive termination of the contract. The majority rejects this assertion on the ground that "factors such as aptitude and ability do not remain constant, but change over time" and thus "cannot be said to vest or accrue." *Ante*, at 210. This conclusion strikes me as utterly implausible.

As the majority appears to concede, *ante*, at 209–210, and as the Board has held, an unconditional seniority provision can confer a seniority right that is "capable of accruing or vesting to some degree during the life of the contract." *United Chrome Products, Inc.*, 288 N. L. R. B. 1176, 1177 (1988). Obviously, an employee's relative seniority, much like his relative "aptitude and ability," will "change over time." That is, a given member of a bargaining unit who is, for example, 12th in seniority when his collective-bargaining agreement expires may be 5th in seniority at a particular time thereafter, depending upon the number of more senior employees who have departed from the workforce. Or an employee could lose his seniority altogether where specified conditions

for such loss have been met. See, *e. g.*, n. 3, *infra*. The fact that, despite the volatility in individual rank, the seniority guarantee might nevertheless vest under the contract means that what vests is not the employee's seniority rank or his right to job security but rather the right to have the *standard* of seniority applied to layoffs.

In my view, a provision granting only "qualified" seniority may vest in the same way. (Here, the provision guaranteeing seniority is "qualified" by the requirement that the employee claiming seniority possess "aptitude and ability" that is equal to that of less senior employees who seek to avoid being laid off.) As with an employee's seniority rank, a given worker's "aptitude and ability" relative to other employees may change over time, yet the right to have layoffs made according to the *standard* of qualified seniority could vest under the contract. Under this view, a laid off employee would have the opportunity to prove to the arbitrator that he should not have been laid off under the terms of the contract because other factors such as aptitude and ability *were* equal at the time he was laid off.

Indeed, I think this is the more plausible reading of the parties' intent in this case, particularly given related contract provisions involving *loss* of seniority. As the Board has previously held, a contract's

> "failure to specify expiration as one of the ways in which seniority rights could be lost indicates that the parties intended that seniority rights remain enforceable after contract termination. Therefore, the grievance over [the employer's] refusal to recall employees by plantwide seniority . . . involves a right worked for and accumulated during the term of the contract and intended by the parties to survive contract expiration." *Uppco, Inc.*, 288 N. L. R. B. 937, 940 (1988).

In the present case, the expired agreement enumerates six specific ways an employee could lose seniority, and these do

not include termination of the agreement. See App. 31.[3] Thus, the qualified seniority at issue in this case would seem as likely to accrue as did the unconditional seniority in *Uppco*.

In any event, the conclusion that the contracting parties in this case did *not* intend qualified seniority rights to vest is sufficiently implausible as to raise serious questions about the majority's assignment of the task of deciding this interpretive issue to itself. Had the majority left this issue to the arbitrator to decide, as *Nolde* requires, the arbitrator would have had the benefit of an evidentiary hearing on the contractual question and the opportunity to explore petitioner's actual postexpiration seniority practices. The contractual text, alone, may not be the only relevant information in determining the parties' intent. Because arbitrators are better equipped to decide such issues and are more familiar with the "'common law of the shop,'" *Nolde, supra,* at 253, quoting *Warrior & Gulf Nav. Co., supra,* at 582, I would have much more confidence in the majority's construction of the contract were that result reached by an arbitrator. In sum, the majority's problematic reasoning regarding the substance of the layoff grievance only underscores the soundness of the *Nolde* presumption of arbitrability which the majority today displaces. Accordingly, I dissent.[4]

---

[3] Section 12 of the expired agreement, entitled "Notice of Layoutt" *[sic]*, contains six subsections addressing, *inter alia*, issues of seniority, layoffs, and recalls. Subsection F, which addresses the recalling of laid off workers, enumerates the six ways in which "[a]n employee shall lose his seniority." App. 31. The "seniority" referred to in subsection F reasonably could be construed as the same seniority that is implied in subsection A, concerning layoffs, and that is expressly identified in subsection E, which requires the employer to "supply the Union with an updated seniority list semi-annually," *id.* See *id.*, at 30–31.

[4] Although I believe the parties have a contractual duty to arbitrate in this case, I agree with the majority's conclusion that the Board articulated rational grounds for not imposing a statutory duty under the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*, to arbitrate grievances aris-

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE SCALIA join, dissenting.

As the Court today recognizes, an employer's obligation to arbitrate postcontract termination grievances may arise by operation of labor law or by operation of the expired collective-bargaining agreement. I think the Court is correct in deferring to the National Labor Relations Board's line of cases and holding that a *statutory* duty to arbitrate grievances does not automatically continue after contract termination by operation of labor law, see *ante*, at 198–203. I also agree with the Court's recognition that notwithstanding the absence of an employer's statutory duty to arbitrate posttermination grievances, a *contractual* duty to arbitrate such grievances may nevertheless exist, see *ante*, at 203–208. I part company with the Court, however, at Part IV–C of its opinion, where it applies its analysis to the case at hand. Because I am persuaded that the issue whether the posttermination grievances in this case "arise under" the expired agreement is ultimately an issue of contract interpretation, I think that the Court errs in reaching the merits of this issue rather than submitting it to an arbitrator in the first instance, pursuant to the broad agreement of the parties to submit for arbitration any dispute regarding contract construction.

---

ing after the termination of a collective-bargaining agreement. See *ante*, at 200–201. In *Indiana and Michigan Electric Co.*, 284 N. L. R. B. 53 (1987), the Board noted that "an agreement to arbitrate is a product of the parties' mutual consent to relinquish economic weapons, such as strikes or lockouts" and therefore the contractual obligation to arbitrate could be distinguished from other "terms and conditions of employment routinely perpetuated [after termination of a collective-bargaining agreement] by the [statutory] constraints of [the unilateral change doctrine]." *Id.*, at 58. Under § 13 of the Act, 29 U. S. C. § 163, the Act may not be construed to interfere with a union's right to strike. Therefore, the Board rationally concluded that employers should not, as a matter of statutory policy, be compelled to arbitrate and thus forbear from using their economic weapons, when no concomitant statutory obligation can be imposed on a union.

In *Nolde Brothers, Inc.* v. *Bakery Workers*, 430 U. S. 243 (1977), a union brought suit against an employer to compel arbitration of the employer's refusal to give severance pay under an expired collective-bargaining agreement to employees displaced by a plant closing. The expired agreement provided that employees who had worked for the employer for at least three years were entitled to severance pay if permanently displaced from their jobs. The union claimed that the right to such severance pay had "accrued" or "vested" during the life of the contract. The employer disavowed any obligation to arbitrate, arguing that the contract containing its commitment had terminated and the event giving rise to the dispute—the displacement of employees during the plant closing—occurred after the contract had expired.

We ruled in favor of the union in *Nolde Brothers.* Integral to our decision was the conclusion that whether or not the right to severance pay had accrued during the contract, and thus whether or not the employer's refusal to offer severance pay was an arbitrable grievance after the contract had expired, was itself a question of contract interpretation. "There can be no doubt that a dispute over the meaning of the severance-pay clause during the life of the agreement would have been subject to the mandatory grievance-arbitration procedures of the contract. Indeed, since the parties contracted to submit 'all grievances' to arbitration, our determination that the Union was 'making a claim which on its face is governed by the contract' would end the matter had the contract not been terminated prior to the closing of the plant." *Id.*, at 249–250 (citation omitted).

Like the expired agreement between the union and Nolde Brothers to arbitrate "all grievances," the terminated agreement between Litton and the Union in this case broadly mandates arbitration of " '[d]ifferences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement.' " *Ante,*

at 194. Because the Union here *alleged* that the seniority clause of the expired agreement was on its face violated by the posttermination layoffs, determining whether the union's grievances arise under the contract requires construction of the seniority provision of the contract and determination of whether this provision applies to posttermination events. As the Court itself notes: "[T]he Board's decision not to order arbitration of the layoff grievances *rests upon its interpretation of the Agreement.*" *Ante*, at 202 (emphasis added).

In my opinion, the question whether the seniority clause in fact continues to provide employees with any rights after the contract's expiration date is a separate issue concerning the merits of the dispute, not its arbitrability. Whatever the merits of the Union's contention that the seniority-rights provision survives the contract's termination date, I think that the merits should be resolved by the arbitrator, pursuant to the parties' broad contractual commitment to arbitrate all disputes concerning construction of the agreement, rather than by this Court.

I respectfully dissent.