HALSEY DRUG CO., INC., Plaintiff,

v.

DRUG, CHEMICAL, COSMETIC, PLASTICS AND AFFILIATED INDUSTRIES WAREHOUSE EMPLOYEES, LOCAL 815, Defendant.

No. 01 CIV. 4899(CM).

United States District Court,
S.D. New York.

March 26, 2002.

James P. Anelli, Esq., St John & Wayne, L.L.C., for Plaintiff.

Andrew S. Hoffman, Esq., Wiseman, Hoffman & Walzer, for Defendant.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff brings this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and requests that this Court determine the arbitrability of certain issues under a collective bargaining agreement between the two parties. Plaintiff also claims jurisdiction under 28 U.S.C. § 1332 and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Both parties move for summary judgment pursuant to Federal Rules of Civil Procedure, Rule 56.

### FACTS PERTINENT TO THIS MOTION

Plaintiff Halsey Drug Co., Inc. ("Halsey") manufactures and distributes pharmaceutical drug products. Defendant Drug, Chemical, Cosmetic, Plastic and Affiliated Industries Warehouse Employees, Local 815 ("Local 815") is a labor organization within the meaning of 29 U.S.C. § 185. Approximately fifty years ago, Local 815 certified a unit of employees at a facility formerly operated by Halsey in Brooklyn, New York that manufactured and distributed various pharmaceutical products produced by Halsey (the "Brooklyn facility"). Pl. 56.1 ¶ 1. Local 815 represented the employees of the Brooklyn fa-

cility since that time until the closing of the Brooklyn facility on March 30, 2001. Pl. 56.1 ¶ 2.

The most recent collective bargaining agreement between Halsey and Local 815 was effective from July 2, 1997 through July 1, 2000. See Bellach Aff. Ex. E (the "CBA"). In the CBA, Halsey recognizes Local 815 "as the sole collective bargaining agent for all employees in its employ, excluding executives, salesmen, technical skilled help in the analytical laboratory, supervisors and armed guards." CBA ¶ 1. The CBA provides:

> This Agreement and all of the conditions and terms thereof shall be binding upon the Employer, and upon each partner of the Employer if such Employer is a partnership, and upon each individual officer of the Employer if the Employer is a corporation, and shall also be binding upon and govern the working conditions and terms of employment in any new or future acquired establishment that the Employer or any partner or officer of the Employer shall acquire, conduct or maintain during the term of this Agreement. CBA ¶ 16.

The CBA also contains a broad grievance and arbitration clause that provides:

> Should any dispute arise concerning the application, interpretation, effect, purpose or breach of any term or condition of this Agreement, or in the event that there shall exist any claim, demand, dispute or controversy between the parties hereto, including but not limited to a demand or dispute arising out of a proposed addition, deletion or modification of this Agreement, the parties hereto shall first attempt to settle and adjust such dispute, claim, demand or controversy by negotiation. In the event that said dispute, claim, demand or controversy shall not be completely settled and adjusted, the parties agree that either of

them may submit the question, including any damages that have been suffered, to arbitration before an arbitrator designated by the New York State Board of Mediation, the American Arbitration Association, or the Federal Mediation & Conciliation Service in accordance with their rules. . . . *It is the intent of the parties hereto that all disputes between them both within and outside of the Agreement, shall be submitted to arbitration and that no defense to prevent the holding of the arbitration shall be permitted.* CBA ¶ 6 (emphasis added).

In late 1999, Halsey decided to close its Brooklyn facility. Pl. 56.1 ¶ 3; Whitney Aff. ¶¶ 2 & 8, Ex. B. At that time, Larry Plotnick served as the President of Local 815. Halsey claims that in late 1999, it informed Local 815 that Halsey would close the Brooklyn facility in the future and would transfer some of its operations to a new facility located in Congers, Rockland County, New York (the "Congers facility"). Pl. 56.1 ¶ 4. Halsey claims that Mr. Plotnick knew that it intended to transfer some of its operations to the Congers Facility, but that during negotiations, Mr. Plotnick stated that "Local 815 had no interest in any of its employees going to work at Halsey's facility in [Congers] insofar as its members had no interest in traveling there because of the time involved and the lack of public transportation." Whitney Aff. ¶ 5. Instead, Halsey contends, Mr. Plotnick stated that Local 815's sole concern was making sure its members received severance. *Id.*

Local 815 argues that Halsey told the union only that the Brooklyn facility would be closed, but did not inform the union that some of the Brooklyn facility's operations were going to be transferred to Congers. Def. 56.1 ¶ 7. Local 815 claims that it believed that Halsey would subcontract

out all of its operations to other manufacturers. *Id.*

On November 29, 1999, Carol Whitney, Vice President of Halsey, sent a letter to Mr. Plotnick regarding the closure of the Brooklyn facility and the proposed severance package for the Local 815 members for his acceptance and approval (the "Closing Agreement"). Pl. 56.1 ¶ 13; Whitney Aff. ¶ 6, Ex. A. Mr. Plotnick signed the letter under the term "Accepted and Approved" on December 3, 1999.

On December 1, 1999, Mr. Michael Reicher, Halsey's Chairman and Chief Executive Officer, sent a memo to all of Halsey's employees advising them of the closure of the Brooklyn facility, and advising them that some work previously done in Brooklyn would be moved to Congers, but that most of the work would be contracted out to third-parties. Whitney Aff. ¶ 8, Ex. B.

On January 14, 2000, Mr. Robert Bellach replaced Mr. Plotnick as Local 815's representative. Def. 56.1 ¶ 2.

By its terms, the CBA was set to expire in July of 2000. On April 17, 2000, Local 815 sent notice to Halsey that it intended to terminate the CBA on its expiration date and to negotiate a successor agreement. Bellach Aff. ¶ 4, Ex. A. Mr. Bellach claims that only after this notice was sent did he learn that Halsey intended to shut down its Brooklyn facility. Bellach Aff. ¶ 5. Ms. Whitney claims that she had had conversations with Mr. Bellach before April about the closing. Whitney Aff. ¶ 9.

In April 2000, Halsey believed that it would shut down the Brooklyn facility in Fall 2000. Rather than negotiate a new contract, the parties extended the terms of the CBA. On August 8, 2000, both parties signed a letter agreement. Whitney Aff. Ex. F. The letter confirms the parties' understanding "regarding the extension of the closing date to Nov. 30, 2000," and provides that "the terms of the Collective Bargaining Agreement between Local 815 and Halsey Drug remain in effect including agreements made concerning the closing of the Brooklyn facility." *Id.*

The closing date of the Brooklyn facility was postponed in Fall 2000. On November 13, 2000, the parties signed another letter agreement "confirm[ing] [their] understanding regarding the shutdown extension until March 31, 2001." Whitney Aff. Ex. G. This agreement states "The terms of the Collective Bargaining Agreement remain in effect and may be renegotiated in the event Halsey continues business until July 1, 2001." *Id.* In addition, "All previous shutdown agreements made between Local 815 I.B.T. and Halsey Drug remain in full force and effect and shall be considered incorporated herein." *Id.*

Thereafter, pursuant to the terms of the CBA Halsey made severance payments to Local 815's members amounting to approximately $286,000 and the Brooklyn facility was closed on March 30, 2001. Whitney Aff. ¶ 16.

On April 3, 2001, counsel to Local 815 sent a formal grievance letter to Halsey stating that pursuant to the terms of the CBA, Local 815 was the exclusive bargaining representative for "all employees in its employ, excluding executives, salesman [sic], technical skilled help in the analytical laboratory supervisors and armed guards." Bellach Aff. Ex. F (citing to CBA ¶ 1). Furthermore, Local 815 argued that pursuant to paragraph 16 of the CBA, the terms of the CBA are "binding upon and govern the working conditions and terms of employment in any new or future acquired establishment." *Id.* (citing to CBA ¶ 16). Relying on these two provisions, Local 815 demanded that (1) Halsey "immediately apply the terms of the collective bargaining agreement to the Congers facil-

ities"; (2) Halsey "immediately offer employment at the Congers facilities to all employees previously laid off at Halsey's Brooklyn facility"; and, (3) that Halsey "immediately provide Local 815 with the names and home address of each of the individuals currently employed at the Congers facilities."

Halsey did not meet Local 815's demands, and Local 815 filed a demand for arbitration with the American Arbitration Association on May 29, 2001.

On June 1, 2001, Halsey filed this action. Halsey seeks a judgment from this Court declaring that (1) Local 815's claimed representation of employees at the Rockland County Facility [Congers facility], and the post termination claims of the Brooklyn Facility employees are claims that arose *after* the expiration of the CBA and that Halsey, as a matter of law, is not required to arbitrate them; and (2) Local 815's attempts to organize the Rockland County Facility cannot be adjudicated through arbitration, but must follow the normal election procedures set forth in the National Labor Relations Act before the National Labor Relations Board (the "Board") who has jurisdiction over this claim. Halsey also asks this court to enjoin Local 815, preliminarily and permanently, from proceeding with arbitration of its post-expiration claims by way of arbitration.

Local 815 contends that the CBA was still binding and had not expired at the time the Brooklyn facility closed because the November 13, 2000 letter extended the CBA until July 1, 2001. Local 815 further argues that, even if the contract had expired, the arbitration clause of the CBA still applies to their claims against Halsey.

Both Halsey and Local 815 have filed motions for summary judgment. I find that this action is arbitrable, and grant summary judgment to Local 815.

## DISCUSSION

Some common precepts govern courts in determining whether a labor dispute is arbitrable. One of these precepts is that "[p]arty consent is the cornerstone of arbitration." *National Cleaning Contractors v. Local 32B–32J*, 833 F.Supp. 420, 424 (S.D.N.Y.1993). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed to submit." *Id.* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960) (other citations omitted)). Another governing precept is that the court, and not the arbitrator, must decide whether a party can be compelled to arbitrate, as well as whether a given dispute is arbitrable. *See Chicago Pneumatic Tool Co. v. Smith*, 890 F.Supp. 100, 112 (N.D.N.Y.1995) (citing *Bevona v. 820 Second Ave. Associates*, 27 F.3d 37, 39 (2d Cir.1994)). The issue of arbitrability is "undeniably one of judicial determination." *Id.*

In determining whether this claim is arbitrable, the Court must first determine whether Local 815 has made a claim that "on its face is governed by the contract." *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 97 (2d Cir.1986). "[A]rbitration must not be denied unless a court is positive that the clause it is examining does not cover the asserted dispute." *Spear, Leeds, Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir.1996).

The CBA contains an extremely broad arbitration clause that covers "all disputes between [Halsey and Local 815] within and outside of" the agreement. Where there is a broad arbitration agreement, there is a presumption of arbitrability which is overcome only if "it may be said with positive assurance that the arbi-

tration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Duane Street Associates v. Local 32B–32J*, 00 Civ. 3861, 2000 WL 802889, at *2 (S.D.N.Y. June 21, 2000) (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (1997)).

Halsey claims that this controversy is not arbitrable because (1) the CBA terminated in July 2000, or at the very latest, March 30, 2001, and Local 815's right ·to arbitrate had expired by the time its grievance was filed in April 2001, and (2) one of the remedies that Local 815 seeks—the right to represent the employees of the Congers facility—should be decided by the NLRB and not an arbitrator. Local 815 argues that (1) the November 13, 2000 letter agreement extended the CBA to July 1, 2001; (2) even if the CBA expired on March 30, 2001, the broad arbitration clause covers the grievance because the grievance arose before that date; and, (3) Section 16 of the CBA clearly addresses Local 815's right to represent employees of the Congers facility, so there is no need to petition the NLRB for such a right.

■ In deciding the arbitrability of labor disputes, courts should not decide the merits of a grievance unless it is impossible to determine the arbitrability of a dispute without an analysis of the terms of the collective bargaining agreement and arbitration clause themselves. *See Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *Nolde Brothers, Inc. v. Local 358, Bakery and Confectionery Workers Union, AFL–CIO*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977); *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery and Tobacco Workers' Int'l Union of America*, 28 F.3d 347 (3d Cir.1994). Here, there is no need to examine the merits of Local 815's grievance. This matter is arbitrable.

In deciding the arbitrability of this action, it is irrelevant whether the CBA had expired by the time Local 815 filed its grievance. Even if the CBA had expired by the time Local 815 filed its grievance with Halsey, the actions that comprised the substance of its grievance clearly arose before the expiration of the CBA and thus were covered by the terms of the CBA. *See Litton*, 501 U.S. at 206, 111 S.Ct. at 2215.

In *Litton*, a check printing plant operator entered into a collective bargaining agreement with the union representing its production employees requiring, in pertinent part, that all differences as to contract construction or violations be determined by arbitration, and that employee grievances that could not be resolved under a two-step grievance procedure be submitted for binding arbitration. The bargaining agreement expired in October 1979, whereupon Litton laid off ten of its plant workers without notice to the Union. The Union then filed grievances on behalf of the laid-off employees. Litton refused to submit to the grievance or arbitration procedures, a position the National Labor Relations Board ("NLRB") later interpreted as a refusal to arbitrate under any circumstances. The NLRB held that Litton's refusal to process the grievances and unilateral refusal to arbitrate were unfair labor practices, in violation of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). But, the NLRB found that disputes concerning the actual post-expiration layoffs did not "arise under" the expired contract and, hence, were not arbitrable. *See Litton*, 501 U.S. at 194–96, 111 S.Ct. 2215.

Both Litton and the Union appealed aspects of the NLRB's order to the Ninth Circuit, and Litton eventually petitioned

for a writ of certiorari. The Supreme Court granted review solely with respect to the question of arbitrability of the layoff grievances. *See id.* at 197–98, 111 S.Ct. 2215. It ultimately ruled that the layoff dispute did not arise under, and consequently was not covered by, the expired agreement. *See id.* at 209–10, 111 S.Ct. 2215. However, in reaching its conclusion, the *Litton* Court reiterated support for the holding in *Nolde Brothers, Inc. v. Bakery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), in which the Court found a presumption in favor of post-expiration arbitration of matters and disputes "arising out of the relation governed by the contract." *Litton,* 501 U.S. at 204, 111 S.Ct. 2215. The *Litton* Court explained that post-expiration grievances arise under the contract, and are therefore arbitrable: (1) when the dispute "involves facts and occurrences that arose before expiration;" (2) when post-expiration action "infringes a right that accrued or vested under the agreement;" or (3) when "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.*

The decision to close the Brooklyn facility was made and was communicated to a union official, Larry Plotnick, in late 1999, while the CBA was still in force, and to his successor no later than April 2000, again while the agreement was in force. Halsey affirmatively alleges that it advised all Brooklyn employees that some work would be moved to a facility in Congers in December 1999. Thus, all the facts underlying the dispute (including the closing of the Brooklyn facility and the opening of a new facility in Congers) arose prior to

March 31, 2000, which was the earliest possible expiration date of the CBA.

There is yet another reason why the dispute is arbitrable. The question that divides the parties—does § 16 of the CBA authorize Local 815 to represent the employees of the new Congers facility?—arises out of the CBA, which by its terms applies to "any new or future acquired establishment that the Employer or any partner or officer of the Employer shall acquire, conduct or maintain during the term of this Agreement." Whether this language covers the Congers facility involves interpreting CBA § 16. This Court cannot engage in this exercise because Halsey unmistakably agreed to arbitrate any dispute "concerning the application, interpretation, effect, purpose or breach of any term or condition of this Agreement." CBA § 6. Halsey's (possibly) post-expiration act infringes on rights that vested or accrued under the CBA if the Congers facility is "any new or future acquired establishment that the Employer or any partner or officer of the Employer shall acquire, conduct or maintain during the term of this Agreement." [1] Whether it is a matter for the arbitrator to determine.

Thus, in accordance with the standard established in *Litton,* this claim is arbitrable.

### CONCLUSION

Halsey's motion for summary judgment on its petition for a declaration that Local 815's grievance is not arbitrable is denied, and Local 815's motion for summary judgment dismissing this action is granted.

This constitutes the decision and order of the Court.

---

1. Of course, if the Agreement did not expire until July 1, 2001, Congers indisputably falls into this category.

The clerk of the Court is instructed to close this case.