[No. B071955. Second Dist., Div. Three. Nov. 30, 1994.]

ENGINEERS AND ARCHITECTS ASSOCIATION, Petitioner and Appellant, v.
COMMUNITY DEVELOPMENT DEPARTMENT OF THE CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Marr & Marchant, Cecil Marr and Diane Marchant for Petitioner and Appellant.

James K. Hahn, City Attorney, Frederick N. Merkin, Assistant City Attorney, and Molly Roff-Sheridan, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**KITCHING, J.—**

### INTRODUCTION

This appeal arises from the denial of a petition to compel arbitration. The petition raised the question whether a collective bargaining agreement excluded from arbitration a managerial decision to lay off an employee because of lack of funding or lack of work. In answering this question, the trial court properly made factual findings in ruling on arbitrability. The contract, and substantial evidence, support the trial court's ruling that this dispute was not arbitrable. We affirm the denial of the petition to compel arbitration.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 1992, petitioner Engineers and Architects Association (the Association) filed a petition to compel arbitration, pursuant to Code of Civil Procedure section 1281.2, naming as respondents the Community Development Department (the Department) of the City of Los Angeles and its

general manager, Parker Anderson (Anderson). The Association acts as an employee organization recognized by the City of Los Angeles (the City) as bargaining representative for "administrative unit" employees, including those working in the Department. The petition specifically concerned Mark Vella (Vella), an industrial commercial finance officer (ICFO).

The Association and the Department signed a collective bargaining agreement, the "memorandum of understanding," setting forth terms and conditions of employment in the administrative unit. Pursuant to articles 1.9 and 3.1 of the memorandum, the parties agreed to submit certain disputes to a grievance procedure that concludes in binding arbitration.

The Industrial, Commercial and Development Division (the ICD) of the Department employs ICFO's to undertake financial analyses associated with the production of loans. The City's employment materials describe an ICFO as developing and securing financing for small- and medium-sized businesses and industrial and commercial development projects. An ICFO also plans, designs, prepares, reviews, and processes loans for businesses and industrial and commercial development projects as part of the Department's comprehensive economic development program.

On March 19, 1992, Anderson informed Vella that the Department intended to lay him off due to lack of work and/or lack of funds. Vella filed a grievance on March 24, 1992, which contended that the action was unnecessary and hence unfair, that sufficient work and funds existed to provide for his position, and that no legitimate reason existed to warrant this action.

Responding to the grievance in an April 9, 1992, letter, the City argued that because Vella made no claim that the layoff was a pretext or subterfuge for discipline, the layoff remained within the City's exclusive management right to relieve a City employee from duty because of lack of work, lack of funds or other legitimate reasons, including abolishment of positions. Therefore the City concluded that the matter was not subject to grievance or arbitration.

Vella filed a second grievance on April 16, 1992. It alleged that on April 13, 1992, Vella was transferred to the enterprise zone section from the marketing section in anticipation that as of July 1, 1992, his position would be eliminated. Vella alleged that he was told his job was being eliminated, first, because there were too many people in the ICD in view of the work load, and second, because the ICD exceeded its budget for staff salary. Vella stated his belief that both reasons were not true, and that sufficient work and more than sufficient funds existed to provide for his position.

Vella also alleged that management gave "pretextual" reasons, and took the action against him because management: (1) used an expedient, easy way to respond to a management audit, which it feared would be negative, to make it appear that management made changes when in fact it made no significant changes at all, and sacrificed Vella to make management "look good to the CAO"; (2) intended to hire private consultants and new employees to perform Vella's work; (3) wanted to avoid further scrutiny of the ICD's operations because it feared unfavorable publicity; (4) wanted to divert attention from the ICD's failure to provide sufficient training to employees; and (5) wanted to camouflage poor management decisions regarding the ICD's loan programs.

On May 22, 1992, Vella and the Association invoked arbitration. The City of Los Angeles Employee Relations Board sent a list of seven arbitrators to the Department and the Association. On June 11, 1992, the Department again rejected Vella's grievance as involving issues within management's exclusive prerogative and not subject to the grievance process.

On June 24, 1992, the Association filed the petition from which this appeal arises. The petition prayed for an order directing the Department and Anderson to cooperate with the Association in selecting an arbitrator and submitting Vella's grievance to arbitration.

The Department's answer set forth the affirmative defense that the City is not required to arbitrate layoffs based on lack of funds, lack of work, or the abolishment of a position. It argued that the courts cannot compel the City to arbitrate a matter it did not agree to arbitrate.

The parties submitted declarations to the trial court supporting their various contentions. On September 4, 1992, the court granted the petition, but set this ruling aside after granting the Department's motion for reconsideration pursuant to Code of Civil Procedure section 1008 on October 8, 1992. The court's order stated that the Association did not sufficiently demonstrate that the layoff was anything other than an economic decision by the Department, which decisions are not subject to arbitration under the management rights provision of the memorandum of understanding. The court further stated that to allow the Association to proceed to arbitration based solely on inferences that sufficient funds may have existed to avoid the layoff would destroy the balance between the competing interests of management and employees.

On October 23, 1992, the Association filed a notice of appeal from the October 8, 1992, denial of its petition to compel arbitration.[1] Further facts necessary to resolution of the issues in this appeal will appear in the "discussion."

## ISSUES

The Association concedes the City's right to lay off employees because of a lack of work or funds, but argues: first, that the right to lay off does not arise unless there is actual lack of work or funds; second, that an employee may, by grievance and arbitration, challenge the City's assertion of lack of work or funds; and third, that an employee may grieve the practical consequences which the City's decision to lay off an employee may have on that employee's wages, hours, or other terms and conditions.

The Association also requests attorney fees.[2]

## DISCUSSION

### 1. *The Documents Applicable to This Case.*

In chapter 8, "Employer-Employee Relations," of the Los Angeles Administrative Code, section 4.865 requires that every memorandum of understanding between the City and any employee organization contain a grievance procedure. In the words of section 4.865, "[s]uch grievance procedure shall apply to all grievances, as defined in Section 4.801 of this Code, shall provide for arbitration of all grievances not resolved in the grievance procedure," and shall conform to procedural standards set forth in section 4.865.

Los Angeles Administrative Code section 4.801 defines "grievance" as "[a]ny dispute concerning the interpretation or application of a written memorandum of understanding or of departmental rules and regulations governing personnel practices or working conditions. An impasse in meeting and conferring upon the terms of a proposed memorandum of understanding is not a grievance." Article 3.1, section I of the memorandum of understanding between the Department and the Association adopts this definition.

Section 4.859 of the Los Angeles Administrative Code states: "Responsibility for management of the City and direction of its work force is vested in

---

[1]An order denying a petition to compel arbitration is appealable. (Code Civ. Proc., § 1294, subd. (a); *Boys Club of San Fernando Valley, Inc.* v. *Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1270 [8 Cal.Rptr.2d 587].)

[2]Given our affirmance of the denial of the petition to compel arbitration, we deny this request for attorney fees.

City officials and department heads whose powers and duties are specified by law. In order to fulfill this responsibility it is . . . the mission of its constituent departments, offices and boards, [to] set standards of services to be offered to the public and exercise control and discretion over the City organization and operations. It is also the exclusive right of City management to take disciplinary action for proper cause, relieve City employees from duty because of lack of work or other legitimate reasons and determine the methods, means and personnel by which the City's operations are to be conducted and to take any necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies; provided, however, that the exercise of these rights does not preclude employees or their representatives from consulting or raising grievances about the practical consequences that decisions on these matters may have on wages, hours and other terms and conditions of employment. . . ."

Article 1.9 of the memorandum of understanding follows this section closely. Because that article, captioned "Management Rights," also contains additional language both more broad and more specific than that in section 4.859, we quote it in full. "As the responsibility for the management of the City and direction of its work force is vested exclusively in its City officials and department heads whose powers and duties are specified by law, *it is mutually understood that except as specifically set forth herein no provisions in this MOU shall be deemed to limit or curtail the City officials and department heads in any way in the exercise of the rights, powers and authority which they had prior to the effective date of this MOU.* The Association recognizes that these rights, powers, and authority include but are not limited to, the right to determine the mission of its constituent departments, offices and boards, set standards of services to be offered to the public, exercise control and discretion over the City's organization and operations, take disciplinary action for proper cause, *relieve City employees from duty because of lack of work, lack of funds or other legitimate reasons,* determine the methods, means and personnel by which the City's operations are to be conducted, take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies; provided, however, that the exercise of these rights does not preclude employees and their representatives from consulting or raising grievances about the practical consequences that decisions on these matters may have on wages, hours, and other terms and conditions of employment." (Italics added.)

In essence, this appeal raises the following issue: when management lays off an employee and alleges lack of work or lack of funding, does the memorandum of understanding place this decision within the grievance and

arbitration procedure? Or does this decision remain an exclusive management right?

### 2. *Arbitrability and the Standard of Review*

The Association claims on appeal that the trial court improperly denied the petition to compel arbitration on the ground that Vella's evidence was not sufficient to prevail. The Association argues that this was not a proper basis for denying the petition to compel arbitration.

Code of Civil Procedure section 1281.2 states in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] (a) The right to compel arbitration has been waived by the petitioner; or [¶] (b) Grounds exist for the revocation of the agreement. [¶] [] [¶] If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit."

■ *United Transportation Union* v. *Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808-809 [9 Cal.Rptr.2d 702], sets forth general principles regarding arbitration: "[U]nder section 1281.2, it is the trial court that determines if there is a duty to arbitrate the particular controversy which has arisen between the parties. [Citation.] In performing its duty to determine if the parties have agreed to arbitrate that type of controversy, the court is necessarily required 'to examine and, to a limited extent, construe the underlying agreement.' (*Ibid.*)

"Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that the arbitration clause cannot be interpreted to cover the dispute. [Citation.] Additionally, 'If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit.' (Code Civ. Proc., § 1281.2; [citations].) ■ Thus, we see that if there is a rule of thumb regarding contractual arbitration, it is that such arbitration is a highly favored means of dispute resolution. This includes labor disputes involving collective bargaining agreements. [Citations.]"

■ "[T]he question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular griev-

ance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (*AT&T Technologies* v. *Communications Workers* (1986) 475 U.S. 643, 649 [89 L.Ed.2d 648, 656, 106 S.Ct. 1415].) The court also determines what issues are subject to arbitration. (*Litton Financial Printing Div.* v. *NLRB* (1991) 501 U.S. 190, 208 [115 L.Ed.2d 177, 198, 111 S.Ct. 2215].)

■ The right to arbitration depends upon contract; a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract. (*Fontana Teachers Assn.* v. *Fontana Unified School Dist.* (1988) 201 Cal.App.3d 1517, 1521 [247 Cal.Rptr. 761]; *Brock* v. *Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1795 [13 Cal.Rptr.2d 678].) There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate. (*Los Angeles Police Protective League* v. *City of Los Angeles* (1988) 206 Cal.App.3d 511, 514 [253 Cal.Rptr. 641].)

■ In ruling on a petition to compel arbitration, the trial court may consider evidence on factual issues relating to the threshold issue of arbitrability, i.e., whether, under the facts before the court, the contract excludes the dispute from its arbitration clause or includes the issue within that clause. (*Unimart* v. *Superior Court* (1969) 1 Cal.App.3d 1039, 1047 [82 Cal.Rptr. 249]; see also *Graphic Arts Internat. Union* v. *Oakland Nat. Engraving Co.* (1986) 185 Cal.App.3d 775, 780 [230 Cal.Rptr. 95] and *Contra Costa Legal Assistance* v. *Legal Services* ( 9th Cir. 1989) 878 F.2d 329, 330.) Parties may submit declarations when factual issues are tendered with a motion to compel arbitration. (*Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 28, fn. 2 [136 Cal.Rptr. 378].)

■ "[T]he applicable standards of appellate review of a judgment based on affidavits or declarations are the same as for a judgment following oral testimony: We must accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence. [Citation.]" (*Betz* v. *Pankow* (1993) 16 Cal.App.4th 919, 923 [20 Cal.Rptr.2d 834].) This court likewise subjects the trial court's factual ruling on arbitrability to the substantial evidence test. (*Retail Clerks Union, Local 775* v. *Purity Stores, Inc.* (1974) 41 Cal.App.3d 225, 232-233 [116 Cal.Rptr. 40].)

3.  *Substantial Evidence Supports the Trial Court's Ruling.*

■ The memorandum of understanding reserves to management the right to lay off employees for lack of work or lack of funds. Article 1.9

recognizes that "the responsibility for the management of the City and direction of its work force is vested exclusively in its City officials and department heads[.]" Article 1.9 then states "it is mutually understood that except as specifically set forth herein no provisions in this MOU shall be deemed to limit or curtail the City officials and department heads in any way in the exercise of the rights, powers and authority which they had prior to the effective date of this MOU." Those rights, powers, and authority include the right to "relieve City employees from duty because of lack of work, lack of funds or other legitimate reasons[.]"

The parties presented the trial court with conflicting evidence as to whether lack of work or lack of funds justified the Department's decision to lay off Vella.

As to lack of work, Vella alleged that loan applications remained relatively constant during 1989, 1990, and 1991; that new programs were created; that riot-affected areas increased workload significantly; that his unit already hired one new employee and was interviewing to hire two more; and that the Department was in the process of seeking $60 million in Department of Housing and Urban Development (HUD) funds. As to lack of funds, Vella alleged a surplus of unspent money in April and May 1992. Vella alleged that federal funding increased from $59,415,778 for fiscal year 1991-1992 to $63,005,271 for fiscal year 1992-1993, and that the Department also had income from repayment of prior loans. Vella also alleged that despite the 20 percent administrative cap, the ICD did not spend $806,653 available in the year beginning July 1, 1991. Vella alleged that for the year beginning July 1, 1992, the ICD would have $3,470,783 in administrative funds, an amount that would increase to cover administrative costs of new riot-related programs.

The Department, however, distinguished between loan applications and loans actually funded. It characterized applications as extremely low and significantly lower than prior years. The same was true of loans funded; from 1984 to 1988, 22 to 30 loans were approved yearly. Seven loans were approved in 1989, twenty in 1990 (of which ten "dropped out"), and six were approved in 1991. The Department had staffed to meet its goal of an annual level of 60 loans approved, and made efforts to increase loan volume during 1990 and the first half of 1991. During budgeting for fiscal year 1992-1993, however, it became clear that volume had not increased and that the existing staffing level could not be justified. The ICD eliminated five positions, including two ICFO positions.

The Department further alleged that a severe local recession and increasingly restrictive federal regulations caused virtually no loans to be made; this

extremely low lending level did not justify ICFO staffing. Although Vella correctly referred to new programs created in the ICD, none of those programs required staffing by an ICFO. New staff were hired into existing vacant positions, not new positions. Work responding to riot recovery efforts had increased, but the increase affected the "Management Analyst" level, not the ICFO level.

The Department characterized Vella's figures concerning administrative funds in April and May 1992 as irrelevant; the Department made cuts necessary to bring it within an administrative cap for the period from July 1, 1992, to June 30, 1993. As to allegations concerning $60 million of HUD funding, those funds had not yet been awarded to the City, and would have no current or foreseeable impact on the staffing level of ICFO's.

The Department also referred to the federal government's requirement that no more than 20 percent of federal funding be spent for administration. The Department shared administrative funds from the federal grant with another city department. In preliminary budget preparation for the 1992-1993 fiscal year, the projected cumulative administrative costs for both departments exceeded the cap by over $1 million. To bring the Department within the cap, cuts were made in areas deemed less productive or critical to the Department's mission. One such area was the ICD loan program, which led to elimination of ICFO's and other positions in the department. Five positions were deleted from the fiscal year 1992-1993 budget request, which the city council and the mayor reviewed and approved.

Having considered the evidence presented by each side, we find that substantial evidence supported the trial court's ruling that the memorandum of understanding excluded this management decision to lay off because of lack of work and/or lack of funds from grievance and arbitration.

4. *The "Practical Consequences" Exception of Article 1.9 Does Not Apply.*

Article 1.9 of the memorandum of understanding states that the exercise of managerial rights "does not preclude employees and their representatives from consulting or raising grievances about the practical consequences that decisions on these matters may have on wages, hours, and other terms and conditions of employment." Vella's layoff, however, did not fall within the category of practical consequences which management decisions have on wages, hours, and terms and conditions of employment.

In *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971], the California Supreme Court interpreted the

Vallejo City Charter which governed public employee contract negotiations. The scope of bargaining provision paralleled the Meyers-Milias-Brown Act, particularly Government Code section 3504, which reads: "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."

The court stated that a reduction of employees based on the city's decision that it employed too large a work force "would not be arbitrable in that it is an issue involving the organization of the service. [¶] Thus cases under the [National Labor Relations Act] indicate that an employer has the right unilaterally to decide that a layoff is necessary, although it must bargain about such matters as the *timing* of layoffs and the *number* and *identity* of the employees affected. [Citation.] In some situations, such as that in which a layoff results from a decision to subcontract out bargaining unit work, the decision to subcontract and lay off employees is subject to bargaining. [Citation.] The fact, however, that the decision to lay off results in termination of one or more individuals' employment is not *alone* sufficient to render the decision itself a subject of bargaining." (*Fire Fighters Union* v. *City of Vallejo, supra*, 12 Cal.3d at pp. 621-622, italics in original.)

*Fire Fighters Union* concluded that because of "the nature of fire fighting," laying off some fire fighters affected the remaining employees' workload and safety. This effect on other employees made a decision to lay off some employees subject to bargaining and arbitration. (12 Cal.3d at p. 622.) The Association, however, does not claim that Vella's layoff affected the workload of other ICFO's, or had other consequences that would be arbitrable because they affected wages, hours, or conditions of employment of remaining Association employees. Vella's grievance instead disputed whether lack of work or lack of funds caused his layoff.

Vella asserted that sufficient money existed to fund, and sufficient work existed to warrant, his continued employment. These assertions underscore the distinction in *Fire Fighters Union* between an arbitrable issue affecting wages, hours, and terms and conditions of employment and a decision to lay off employees because of lack of funds or lack of work. The latter decision remains nonarbitrable as an exclusive management right.

## CONCLUSION

Vella's grievance raised a challenge to an exclusive management decision which does not properly come before an arbitrator. We conclude that the trial court, *based on substantial evidence*, correctly denied the petition.

## DISPOSITION

The denial of the petition to compel arbitration is affirmed. Costs to Department.

Croskey, Acting P. J., and Parkin, J.,* concurred.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.