**MICHIGAN AFSCME COUNCIL 25, Plaintiff,**

v.

**AURORA HEALTHCARE, INC., Salem Management, Board of Directors of Aurora Healthcare, Inc., Dr. Soon Kim, Ervin Johnson, Jr., and Vanessa Lewis, Defendants.**

No. 01–75027.

United States District Court,
E.D. Michigan,
Southern Division.

April 14, 2003.

Bruce A. Miller, Esq., John F. Burns, Esq., Detroit, for Plaintiff.

Thomas H. Williams, Esq., Detroit, for Defendant.

## *OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL AND SUMMARY JUDGMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiff Michigan AFSCME Council 25 brought this suit on December 28, 2001, seeking an order enjoining Defendant Aurora Healthcare, Inc. from laying off any employees represented by the Plaintiff union. The complaint was accompanied by a motion for preliminary injunctive relief, which the Court addressed at a hearing held on January 3, 2002.[1] Following the resolution of this matter, Plaintiff filed an amended complaint on March 1, 2002, naming as additional Defendants: (i) the Board of Directors of Aurora Healthcare; (ii) Salem Management, a company which provided management services to Aurora Healthcare; (iii) Dr. Soon Kim and Ervin Johnson, Jr., the alleged owner and chief executive officer of Aurora Healthcare; and (iv) Vanessa Lewis, Aurora's director of human resources. In this amended complaint, Plaintiff asserts claims of breach of contract, promissory estoppel, and violation of the federal Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.*, all arising from the decision in late December of 2001 to lay off most of Aurora's employees and close its mental health care facility.[2]

On August 21, 2002, shortly before the close of discovery, Defendants Aurora Healthcare, its Board of Directors, and Vanessa Lewis filed the present motion, seeking the dismissal of certain claims against them and summary judgment in their favor as to the remaining claims.[3] This motion has been fully briefed by Defendants and Plaintiff, and the Court held a hearing on this motion on April 3, 2003.

---

1. At this hearing, the Court agreed to award some of the relief sought by Plaintiff, but declined to enter an order enjoining Defendant Aurora Healthcare from going forward with any further layoffs. Although directed to do so, the parties have never presented a proposed order encompassing the Court's rulings at the January 3 hearing.

2. Although the amended complaint continues to refer to injunctive relief, it appears that this pertains solely to the layoff of employees represented by the Plaintiff union. Any such planned layoffs presumably have already occurred. This aspect of the case, then, has seemingly been resolved through the Court's prior rulings on Plaintiff's motion for a preliminary injunction.

3. The other Defendants in this case, Salem Management, Dr. Soon Kim, and Ervin Johnson, Jr., failed to timely respond to the amended complaint, and the Clerk of the Court entered defaults against them. In a recent Opinion and Order, the Court ordered that these defaults be set aside. These Defendants, however, are not parties to the present motion. Accordingly, throughout the balance of this Opinion, the Court uses "Defendants" as a shorthand for the moving parties only— Aurora Healthcare, its Board of Directors, and Vanessa Lewis.

Having reviewed the parties' written submissions and the record as a whole, and having considered the arguments of counsel at the April 3 hearing, the Court now is prepared to rule on Defendants' motion. This Opinion and Order sets forth the Court's rulings.

## II. FACTUAL BACKGROUND

The Court briefly summarizes the pertinent facts here, with more to follow as they bear upon the specific issues presented in Defendants' motion. Until late December of 2001, Defendant Aurora Healthcare operated a mental health care facility that provided inpatient, outpatient, and partial hospitalization care for mentally ill individuals in the Detroit area. The majority of Aurora's patient load derived from referrals from the Detroit–Wayne County Community Mental Health Agency ("WCCM").

On December 19, 2001, WCCM announced that it would no longer refer patients to Aurora's facility. WCCM also decided, effective December 31, 2001, that it would not renew its contract with Aurora, and it advised Aurora to make arrangements to transfer all. of WCCM's referral patients to other medical providers by January 31, 2002. Faced with this loss of business, Aurora embarked upon layoffs of most of its employees. Defendants state that Aurora now has thirteen employees, where previously it had employed several hundred individuals.

Prior to these events, on October 26, 2001, the Plaintiff union was elected as the collective bargaining unit representative for certain of Aurora's employees. Following this election and an accompanying certification by the National Labor Relations Board ("NLRB"), Plaintiff initiated collective bargaining with Aurora. As the parties embarked upon this process, Plaintiff requested and Aurora agreed to preserve the status quo with regard to the wages, benefits, and other terms and conditions of employment of all bargaining unit employees. In particular, Aurora agreed to adhere to the terms and conditions set forth in its existing Employment Policies and Procedures Handbook, including its grievance and layoff procedures.

The parties apparently held negotiating sessions in November and December of 2001. They did not, however, reach an agreement upon a collective bargaining agreement ("CBA") before Aurora commenced its mass layoffs in late December of 2001. Nevertheless, Plaintiff maintains that it may pursue breach-of-contract claims, under either federal or state law, based upon Defendants' alleged violations of the terms and conditions of the parties' "status quo" arrangement, and particularly Aurora's employee handbook. Most significantly, Plaintiff contends that Defendants violated this handbook's layoff policies and procedures in selecting employees for layoff. Plaintiff further asserts that Defendants violated the federal WARN Act by failing to provide the requisite sixty-days' written notice before closing Aurora's mental health care facility and embarking upon mass layoffs.

## III. ANALYSIS

### A. The Standards Governing Defendants' Motion

In their present motion, Defendants rely upon Fed.R.Civ.P. 12(b)(6) and Fed. R.Civ.P. 56 as alternative bases for challenging Plaintiff's claims. In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court is required to accept as true the well-pleaded factual allegations set forth in Plaintiff's Complaint. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). However, the Court "need not

accept as true legal conclusions or unwarranted factual inferences." *Morgan*, 829 F.2d at 12.

Under the latter Rule cited by Defendants, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> \* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> \* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> \* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> \* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply the above standards in resolving Defendants' motion to dismiss and for summary judgment.

**B. Plaintiff's Federal and State–Law Breach of Contract Claims**

■ As noted, Plaintiff's limited negotiations with Aurora Healthcare failed to result in a collective bargaining agreement. While the parties sought to reach such an agreement, however, Aurora agreed to adhere to the existing terms and conditions governing its employees, including the terms of Aurora's Employment Policies and Procedures Handbook. In its complaint, Plaintiff alleges that Defendants violated this arrangement, and that these purported violations give rise to a breach of contract claim under federal

law—specifically, § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Alternatively, in the absence of a federal claim, Plaintiff suggests that it may pursue a breach of contract claim under Michigan law. Through their present motion, Defendants challenge both of these propositions. The Court will consider Plaintiff's federal and state-law theories in turn.

Regarding Plaintiff's breach of contract claim under § 301 of the LMRA, the parties' briefs unfortunately shed little light on this issue. Defendants' motion rests on the simple premise, unsupported by citation to any authority, that a § 301 claim cannot survive absent a collective bargaining agreement. Plaintiff responds by correctly citing *International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers—Local 1603 v. Transue & Williams Corp.*, 879 F.2d 1388, 1392–93 (6th Cir.1989), for the general proposition that a formal collective bargaining agreement is *not* an absolute prerequisite to a § 301 claim. In reply, Defendants identify factual distinctions between *Transue & Williams* and this case, but largely fail to suggest how these distinctions make a legal difference, and again do not cite any relevant authority. Consequently, the Court has been left primarily to its own devices in locating the case law that bears most directly on its inquiry.

As noted, one thing is clear—namely, that the absence of a formal collective bargaining agreement is not an absolute bar to Plaintiff's § 301 claim. *Transue & Williams* explains that a § 301 "contract" encompasses "any agreement between employers and labor organizations significant to the maintenance of labor peace between them." *Transue & Williams*, 879 F.2d at 1392 (internal quotations and citation omitted). Thus, "[s]ection 301 jurisdiction does not require a collective bargaining agree-

ment between the parties," nor does it "require the parties to enjoy a meeting of the minds on all issues of a completed labor contract." 879 F.2d at 1392. The Court elaborated:

A labor contract may fall within the parameters of Section 301 even if the employer and the union have not resolved disputes over substantive terms, including wage rates and work place conditions. Because federal labor policy has emphasized the important goal of maintaining industrial peace, the technical rules of commercial contract law need not be strictly applied to labor contracts. Thus, the existence of a labor contract does not depend on its reduction in writing; it can be shown by *conduct* manifesting an intention to abide by agreed-upon terms.

879 F.2d at 1392 (internal quotations and citations omitted).

The Court then turned to the facts of the case before it. When the parties' existing collective bargaining agreement was set to expire, they successfully negotiated most of the terms of a new agreement, but their negotiations broke down over a single issue. As a result, a new agreement was never executed, and operations continued without a formal collective bargaining agreement. Several months after the termination of the prior agreement, the defendant company announced a planned shutdown of one of its plants. The plaintiff union presented three grievances arising from this planned shutdown, but the defendant refused to process any of these grievances, on the ground that any grievance or arbitration obligations had lapsed with the expiration of the parties' collective bargaining agreement.

The District Court held that the terms agreed to in the parties' most recent negotiations, and particularly the grievance and arbitration provisions of the proposed

new collective bargaining agreement, were sufficient to sustain jurisdiction under § 301. In affirming this ruling, the Sixth Circuit cited conduct by the parties that evidenced "an intent to remain bound to the grievance and arbitration provisions" of the new agreement, even though it was never formally executed. 879 F.2d at 1393. The Court noted, for example, that in the months following the expiration of the prior agreement, the defendant had "accepted, processed, and responded to over fifteen grievances pursuant to the procedures established by" the proposed new agreement. 879 F.2d at 1393. In addition, the parties' impasse involved only a single clause of this proposed agreement, while they agreed on all remaining terms, including the grievance and arbitration provisions. Thus, the Court held that these provisions could be enforced in a § 301 action.

Returning to the present matter, Defendants rightly point out a number of factual distinctions between *Transue & Williams* and this case. Most importantly, the parties here have never executed a collective bargaining agreement. In *Transue & Williams,* as in virtually every case identified in the Court's research, the parties' dispute arose in a post-expiration period, after a prior collective bargaining agreement had lapsed but before a new one had been reached. This is significant, because it evidences *some* meeting of the minds, at least at some point, and at least as to the terms of the expired collective bargaining agreement. Such a prior agreement potentially narrows the inquiry to the question whether the parties intended that the terms of the expired agreement should continue to govern their relationship while they sought to achieve a new agreement.

Here, by contrast, there is virtually no evidence of a meeting of the minds between the Plaintiff union and Aurora at any time or on any subject. Aurora's existing policy and procedure handbook does not reflect such an agreement, as Aurora unilaterally promulgated these policies and procedures at a time before Plaintiff had been elected and certified as the employees' bargaining representative. Nor, in contrast to *Transue & Williams,* has Plaintiff produced any evidence that the handbook topics at issue here—primarily, the procedures governing layoffs and grievances—were the subject of contract negotiations between the parties, much less that the parties had reached even a tentative agreement or understanding that the handbook's provisions would be carried over in something like their present form to a collective bargaining agreement. Rather, the parties adhered to the handbook provisions only by default, because they had *not* reached any agreement on any superceding terms or provisions governing the subjects of layoffs and grievances. While the parties attempted to negotiate this agreement, and until they reached an impasse, Aurora was obligated by law not to modify most of the terms and conditions of employment, *see NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962), and Plaintiff expressly reminded Aurora of this obligation at the outset of contract negotiations.

■ Under these circumstances, where an employer adheres to the existing terms and conditions of employment in accordance with its duty to bargain in good faith under § 8(a)(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(5), the courts have held that the retention of existing terms and conditions, standing alone, does not support the inference that the employer entered into an implied contract enforceable under § 301. *See, e.g., International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union 1199 v. Pepsi–Cola Gen'l Bottlers, Inc.,* 958 F.2d 1331, 1334–36 (6th Cir.1992); *United Automobile, Aerospace*

& *Agricultural Implement Workers, Local 33 v. R.E. Dietz Co.,* 996 F.2d 592, 595 (2d Cir.1993). The employer's adherence to pre-existing terms does not reflect an "implied contractual obligation" to do so, but instead "supports the inference that [the employer] wishe[s] to avoid violating § 8(a)(5)" of the NLRA. *Pepsi–Cola,* 958 F.2d at 1336.

▪ In the context of an expired collective bargaining agreement, the Supreme Court has emphasized this distinction between contractual obligations and duties imposed by law under the NLRA:

> [A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied. Although after expiration most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bargain, those terms and conditions no longer have force by virtue of the contract. .... Under *Katz,* terms and conditions continue in effect by operation of the NLRA. They are no longer agreed-upon terms; they are terms imposed by law, at least so far as there is no unilateral right to change them .... [T]he obligation not to make unilateral changes is rooted not in the contract but in preservation of existing terms and conditions of employment and applies before any contract has been negotiated. *Katz* illustrates this point with utter clarity, for in *Katz* the employer was barred from imposing unilateral changes even though the parties had yet to execute their first collective-bargaining agreement.

*Litton Financial Printing Div. v. NLRB,* 501 U.S. 190, 206–07, 111 S.Ct. 2215, 2225–26, 115 L.Ed.2d 177 (1991).

Here, the bulk of the evidence cited by Plaintiff as giving rise to contractual obli-

gations enforceable under § 301 merely demonstrates Aurora's intention to continue operating under its employee handbook, as well as Plaintiff's insistence that Aurora do so, until the parties reached agreement on a contract. Nothing in the record suggests that Aurora proposed or Plaintiff assented to the preservation of the handbook's layoff or grievance procedures in any eventual collective bargaining agreement. Indeed, the record fails to disclose that the parties even broached these subjects at their negotiating sessions; the only apparent "meeting of the minds" was the parties' mutual understanding that Aurora was forbidden under the NLRA from unilaterally changing most terms and conditions of employment. Thus, to the extent that Aurora might have deviated from the terms of its employee handbook during its mass layoffs and the closing of its facility, Plaintiff might be able to pursue unfair labor practice charges before the NLRB, but it does not have a right of action under § 301 of the LMRA. *See Pepsi–Cola,* 958 F.2d at 1336.

Although Plaintiff's counsel identified one exception to this rule at the April 3, 2003 hearing, this exception does not rescue Plaintiff's § 301 claim as it is now presented. In particular, Plaintiff notes that the *Katz* prohibition on unilateral changes during contract negotiations does not extend to arbitration provisions. *See Litton,* 501 U.S. at 199–201, 111 S.Ct. at 2222–23; *Pepsi–Cola,* 958 F.2d at 1336. Assuming, for the moment, that this exception to *Katz* applies equally to the grievance procedure at issue here—a debatable proposition, *see Pepsi–Cola,* 958 F.2d at 1336 (distinguishing between arbitration and less formal types of grievance processing)—Plaintiff maintains that Aurora was free to abandon the grievance mechanism set forth in its employee handbook while the parties negotiated a collective bargaining agreement. Yet, Aurora

did not do so—to the contrary, the evidence indicates that Aurora continued to apply the handbook's grievance procedure on at least six separate occasions, and that the Plaintiff union filed and pursued at least some of these grievances on behalf of represented employees. Plaintiff argues that this conduct gives rise to an implied contract that can sustain its § 301 claim.

Whatever the contours of such a contract, however, it is clear that it would not give rise to the form of relief now sought by Plaintiff. Not surprisingly, and as demonstrated in the very case cited by Plaintiff in support of its § 301 claim, the remedy for a breach of a contractual dispute resolution provision is an order directing the parties to employ the agreed-upon dispute resolution procedure. *See Transue & Williams*, 879 F.2d at 1391–94. In the present case, then, the § 301 contract posited by Plaintiff would bestow only the right to injunctive relief requiring the parties to resolve their various disputes through the grievance procedure set forth in Aurora's employee handbook. Yet, Plaintiff's counsel acknowledged at the April 3 hearing that the union no longer seeks injunctive relief; rather, Plaintiff seeks to present its disputes with Aurora for resolution in this judicial forum by a trier of fact. Such a remedy cannot possibly be warranted under § 301, as it would not enforce any contractual rights in this case—to the contrary, it would be directly at odds with the parties' alleged agreement to resolve their disputes through Aurora's pre-existing grievance procedure.

Indeed, even if the parties' disputes were given over to the trier of fact for resolution, Plaintiff has failed to suggest the substantive terms by which these disputes would be adjudged. As noted earlier, there is no evidence that the parties reached any agreement on the terms and conditions of employment; Aurora merely retained its existing terms and conditions during collective bargaining out of a legal obligation to do so. The purported § 301 contract in this case is, in essence, a free-floating grievance provision, untethered to any substantive terms. As the Supreme Court has succinctly stated, "[t]he object of an arbitration clause is to implement a contract, not to transcend it." *Litton*, 501 U.S. at 205, 111 S.Ct. at 2225. Here, there is no such contract to implement, or at least no such agreement to which Plaintiff and Aurora are parties. Accordingly, the Court finds that Defendants are entitled to summary judgment in their favor on Plaintiff's § 301 claim.

Alternatively, Plaintiff suggests that Defendants' alleged violations of the employee handbook give rise to a state-law breach of contract claim. Initially, the Court notes the facial implausibility of the proposition that Plaintiff might be able to pursue such a claim here. The Court's ruling as to Plaintiff's federal claim, after all, rests upon the lack of evidence that the parties entered into *any* contract, whether express or implied. While individual employees of Aurora might be able to point to the employee handbook as giving rise to contractual obligations,[4] the Court has found no evidence that Plaintiff was a party to such a contract, with the possible exception of the limited agreement to employ the handbook's dispute resolution procedure. In the absence of a binding contract between the parties here, Plaintiff and Aurora, it is difficult to see how Plaintiff can sustain a breach of contract claim under *any* body of law, whether state or federal. In particular, a contract surely is

4. In the event that this sort of individual contract were at issue here, Plaintiff would have to establish its standing to pursue breach of contract claims on behalf of individual employees. The Court need not reach this question, however, because Plaintiff has not advanced this theory.

the *sine qua non* of a breach of contract recovery under Michigan law, just as it is under § 301, and Plaintiff has cited no authority that might lead the Court to conclude otherwise.

Certainly, the lone case cited by Plaintiff on this issue, *AFSCME v. Board of Educ. of School Dist. of City of Highland Park*, 457 Mich. 74, 577 N.W.2d 79 (1998), does not in any way establish the viability of Plaintiff's state-law claim. In that case, the plaintiff union brought a breach of contract claim under the Public Employment Relations Act, Mich. Comp. Laws § 423.201 *et seq.*, the Michigan counterpart to the federal NLRA. No common-law claim was asserted; rather, the case was governed by state versus federal law because the collective bargaining agreement at issue governed municipal employees. Conversely, if there were evidence of a collective bargaining agreement in this case, it would be governed by federal versus state law—specifically, § 301. *See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co.*, 369 U.S. 95, 102–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962). Because the record fails to disclose any such agreement between Plaintiff and Aurora, Defendants are entitled to summary judgment in their favor on Plaintiff's breach of contract claim, whether under state or federal law.[5]

## C. Plaintiff's Federal WARN Act Claim

■ Under the federal WARN Act, an employer generally must provide sixty-days' written notice of a plant closing or mass layoff. 29 U.S.C. § 2102(a). It is undisputed that no such notice was provided here. Nonetheless, in seeking summary judgment in their favor on Plaintiff's WARN Act claim, Defendants appeal to a statutory exception for "unforeseeable circumstances":

An employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

29 U.S.C. § 2102(b)(2)(A). Defendants contend that this exception applies here, where Aurora purportedly learned only on December 19, 2001 that WCCM did not intend to renew its contract, and where this loss of a primary source of business allegedly forced Aurora into mass layoffs just a few days later.

The parties agree that the Department of Labor's implementing regulations provide useful guidance on this issue. These regulations state, in relevant part:

(1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and

---

**5.** Apart from these breach of contract claims, Plaintiff's complaint also invokes the common-law doctrine of promissory estoppel. As noted in Defendants' motion, however, the complaint includes absolutely no allegations in support of this theory. Moreover, the only promise identified in the complaint is Aurora's assurance that it would adhere to the terms of the employee handbook while the parties negotiated a collective bargaining agreement. This could not reasonably be expected to induce any action by Plaintiff or its membership in reliance on this statement, as Aurora did nothing more than assure Plaintiff that it was aware of its legal obligation to preserve the status quo during contract negotiations. In any event, Plaintiff has not addressed this matter in its response to Defendants' motion, and so the Court assumes that this theory has been abandoned.

dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable . . . .

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

20 C.F.R. § 639.9(b).[6] Not surprisingly, Defendants point to the regulation's "termination of a major contract" example as precisely what occurred here, and Plaintiff does not deny that the WCCM contract was crucial to Aurora's financial health and survival.

The question becomes whether the loss of the WCCM contract was "sudden and unexpected." In arguing that it was not, Plaintiff quotes extensively from the deposition testimony of Ervin Johnson, Jr., Aurora's chief executive officer at the time of the mass layoffs. Johnson testified that Aurora experienced cash flow problems as long ago as 2000, as a result of about $4 million in debts that were owed by WCCM but had not been paid. Although Johnson's testimony is not altogether clear on this point, it appears that he attributed Aurora's layoffs in part to this ongoing cash flow problem, as well as the loss of the WCCM contract. (*See* Johnson Dep. at 76–79.)

Next, Plaintiff cites Johnson's testimony that, in the fall of 2001, Aurora was put on notice that its WCCM contract was in

jeopardy because of concerns that Aurora was not in compliance with WCCM's policies and procedures. To address these concerns, Aurora developed a number of corrective plans. These "storm clouds" are confirmed in a September 24, 2001 letter to Johnson from WCCM's executive director, Dr. Altha J. Stewart:

Enclosed is the Survey Report for Aurora Healthcare, Inc. A full comprehensive survey was conducted by the review team from the Detroit–Wayne County Community Mental Health Agency (Agency) on September 4, 5, and 6, 2001. This review followed notification of Aurora's immediate jeopardy of losing Medicare certification on September 14, 2001. The review also served to monitor Aurora's implementation of the three (3) Agency approved Plans of Correction (POC) and Performance Objectives. Corrective action steps are required to be implemented as specified by the Agency in this report.

Intensive monitoring including technical assistance will be provided to Aurora over the next 90 days to ensure Aurora is able to complete the needed corrective action and the full implementation of all outstanding plans of correction. At the end of this period a full site visit will be conducted to verify completion of the plans of correction. Failure to meet these expectations can result in sanctions as stipulated in the Aurora Healthcare, Inc. contract with the Agency.

(Plaintiff's Response, Ex. A, Stewart 9/24/2001 letter.)

To be sure, this letter does not expressly state that Aurora's contract with WCCM was in immediate danger of termination. In addition, Johnson testified as to his

---

**6.** Plaintiff cites other language in this regulation for the proposition that the "unforeseeable circumstances" exception is to be "narrowly construed." 20 C.F.R. § 639.9(a). In fact, this "narrowly construed" language applies to a different, "faltering company" exception, and not the "unforeseeable circumstances" exception.

 

confidence that Aurora would be able to successfully address the compliance concerns referred to in Dr. Stewart's letter. Nonetheless, it is the employer's burden to show that it should be relieved of the WARN Act's usual requirement of sixty-days' notice of a plant closing or mass layoffs. *See* 20 C.F.R. § 639.9. Under the record presented, with its indications that Aurora executives had at least some advance warning of the very real possibility that the WCCM contract might not be renewed, and absent any evidence of assurances from WCCM that this contract was secure, the Court cannot say as a matter of law that Aurora has met its burden of establishing the applicability of the "unforeseeable circumstances" exception. Indeed, Defendants' counsel acknowledged this outstanding issue of fact at the April 3 hearing. It follows that Defendants are not entitled to summary judgment on Plaintiff's WARN Act claim.

### D. Plaintiff's Claims Against Individual Defendant Vanessa Lewis

As the final ground for their motion, Defendants assert that Plaintiff has failed to identify a basis for the imposition of liability on individual Defendant Vanessa Lewis, Aurora's director of human resources. In response, Plaintiff candidly acknowledges that it has failed to uncover any evidence in support of its "alter ego" theory as to Defendant Lewis. Accordingly, Defendant Lewis is entitled to summary judgment in her favor as to the claims asserted against her in Plaintiff's complaint.

### IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' August 21, 2002 Motion for Partial Dismissal or for Summary Judgment is DENIED IN PART, as to Plaintiff's WARN Act claim, and is otherwise GRANTED, in accor-

dance with the rulings in this Opinion and Order.