Filed 9/2/20

**CERIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NEAL MORITZ et al., | B299083 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 18SMCV00036) |
| v. | |
| UNIVERSAL CITY STUDIOS LLC et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig D. Karlan, Judge. Affirmed.

Quinn Emanuel Urquhart & Sullivan, Bruce E. Van Dalsem, Daniel C. Posner and M. Alex Bergjans for Defendants and Appellants.

Kinsella Weitzman Iser Kump & Aldisert, Dale F. Kinsella, Suann C. MacIsaac and Zachary T. Elsea for Plaintiffs and Respondents.

Over the course of approximately 16 years, respondents Neal Moritz and Neal H. Moritz, Inc. (collectively, Moritz) worked for appellants, Universal City Studios LLC and its wholly-owned subsidiary, FFSO Productions LLC (collectively, Universal), rendering services as a producer for the film The Fast and the Furious (Universal Pictures 2001) and several sequels thereto (collectively, the Fast & Furious franchise). The lawsuit underlying this appeal involves a "spin-off" of the Fast & Furious franchise, a project ultimately released as Fast & Furious Presents: Hobbs & Shaw (Universal Pictures 2019) (Hobbs & Shaw), on which Moritz allegedly worked as a producer pursuant to an oral agreement with Universal. Moritz named Universal, as well as appellant Jimmy Horowitz, president of Universal City Studios LLC (collectively, appellants) as defendants in the suit. Appellants moved to compel arbitration of the suit based on arbitration agreements in written producer contracts regarding Moritz's work for Universal on the Fast & Furious franchise. The court concluded that these arbitration agreements did not apply to the Hobbs & Shaw dispute, and denied appellants' motion.

Appellants contend the court erred by deciding whether the Hobbs & Shaw dispute was arbitrable under the arbitration agreements contained in the Fast & Furious contracts, as those agreements are valid and binding on all parties and delegate the question of arbitrability to an arbitrator. We disagree, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Parties' Producer Contracts Regarding the Fast & Furious Franchise*

It is undisputed that Moritz and Universal entered into seven written producer contracts setting forth the terms under which

Moritz rendered services as a producer on the films in the Fast & Furious franchise, and that all these contracts (collectively, the Fast & Furious contracts) remain valid and binding.  Specifically, that Moritz and Universal entered into separate contracts for the first, second, third, fourth, sixth and seventh movies in the franchise:  The Fast and the Furious (Universal Pictures 2001), 2 Fast 2 Furious (Universal Pictures 2003), The Fast and the Furious: Tokyo Drift (Universal Pictures 2006), Fast & Furious (Universal Pictures 2009), Fast & Furious 6 (Universal Pictures 2013), and Furious 7 (Universal Pictures 2015) (respectively, the FF1 contract, FF2 contract, FF3 contract, FF4 contract, FF6 contract, and FF7 contract).  They entered into no written contract regarding the fifth movie in the franchise, Fast Five (Universal Pictures 2011).  Finally, they entered into a single written producer contract to govern the eighth, ninth, and tenth movies in the franchise (the FF8-10 contract).  The FF8-10 contract is less than two pages long and requires that the terms of the FF7 contract (with limited modifications) apply to any movie constituting a "sequel" or "remake" of earlier films in the franchise. Of the movies contemplated by the FF8-10 contract, only the eighth movie in the franchise, The Fate of the Furious (Universal Pictures 2017), has been made to date.  The parties agree The Fate of the Furious (Universal Pictures 2017) constitutes as a sequel for the purposes of the FF8-10 contract.

It is also undisputed that the first six of the Fast & Furious contracts contain valid arbitration clauses.  Specifically, the FF1, FF2, FF3, and FF4 contracts all provide, in pertinent part, that "[a]ny controversy, claim, or dispute arising out of or related to this [a]greement or the interpretation, performance, or breach hereof . . . shall be resolved according to the procedures set forth in this paragraph which shall constitute the sole dispute

resolution mechanism hereunder." In all four contracts, these procedures require arbitration when initial mediation is unsuccessful.

The FF6 and FF7 contracts provide that "[a]ny controversy, claim, or dispute arising out of or relating to this [a]greement or this agreement to arbitrate, including, without limitation . . . any such controversy, claim or dispute against or involving any officer, director, agent, employee, [or] affiliate . . . of a party to this Agreement . . . shall be fully and finally adjudicated by binding arbitration to the fullest extent allowed by law."

The FF8-10 contract includes no separate arbitration clause, but the contract subjects movies produced as "sequels" or "remakes" to the arbitration clause in the FF7 contract.

The arbitration clauses in the FF1-FF4 contracts delegate questions of arbitrability to an arbitrator by providing that "[t]he arbitration shall be initiated and conducted according to the JAMS/Endispute Comprehensive Arbitration Rules and Procedure" (JAMS rules). The JAMS rules, in turn, require that "[j]urisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which [a]rbitration is sought . . . shall be submitted to and ruled on by the [a]rbitrator. The [a]rbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." We will call this a delegation clause.

The arbitration clauses in the FF6 and FF7 contracts contain no similar delegation clause, but provide that "[a]ny controversy, claim, or dispute arising out of or relating to this [a]greement *or this agreement to arbitrate* . . . shall be fully and finally adjudicated by binding arbitration to the fullest extent allowed by law." (Italics added.)

4

## B. *The Hobbs & Shaw Project*

During work on the eighth movie in the Fast & Furious franchise, Moritz and Universal began discussing a spin-off film referred to as Hobbs & Shaw, which would be based on characters from prior films in the franchise. The FF8-10 contract did not subject Hobbs & Shaw to the modified terms of the FF7 contract, as the film was neither a "remake" nor a "sequel."

Moritz and Universal exchanged written drafts of a producer contract for Hobbs & Shaw, which included a proposed arbitration agreement, but the parties never finalized or signed any written contract agreement for Moritz's work on the film.

Shortly before filming of Hobbs & Shaw was set to begin, Universal informed Moritz that "Universal is under no obligation to involve . . . Moritz in the production [of Hobbs & Shaw], nor to compensate [him] in connection with it," and instructed Moritz not to "render any services in connection with the [p]icture or be involved with the production in any capacity" "until such time as an agreement is reached."

## C. *Moritz's Complaint Regarding Hobbs & Shaw*

Soon after Universal advised Moritz of its view that the parties had no binding agreement regarding Hobbs & Shaw, Moritz sued Universal,[1] alleging that Moritz and Universal had reached a binding oral agreement regarding Moritz's work on the film, which Universal had breached. The operative version of Moritz's complaint is the first amended complaint (FAC), filed June 28, 2019.

---

[1] Moritz later added appellant Jimmy Horowitz as a defendant as well.

In the FAC, Moritz alleges that in connection with the Fast & Furious contracts, Moritz and Universal had "fully negotiated and agreed upon an oral producer deal before any writings were exchanged" (italics omitted), and that "[t]ypically, Moritz would begin working on the production of the film prior to the oral producer deal being reduced to writing." Moritz alleges that this again occurred with respect to Hobbs & Shaw, but this time, Universal failed to honor the terms of the parties' oral agreement.

The FAC summarizes key financial provisions of the various Fast & Furious contracts, and alleges that "[f]or purposes of this [c]omplaint, there is one written producer agreement between Moritz and Universal that is relevant[,] . . . [t]he FF8-10 [contract]." More specifically, Moritz alleges that "before beginning substantial work on the [p]icture, the [p]resident of Universal [City Studios LLC] . . . orally agreed with Moritz that [Moritz's] . . . compensation for producing Hobbs [&] Shaw would be . . . the first dollar gross compensation option in the FF8-10 [a]greement." (Italics omitted.) Similarly, the FAC alleges that the financial terms for the Hobbs & Shaw producer contract were "modeled after the first dollar gross compensation option in the FF8-10 [a]greement," and that "[t]he parties had never discussed or agreed that the financial terms of the Hobbs & Shaw producer deal would be anything other than the first dollar gross option that had been contained in [Moritz's] last producer deal, which was the FF8-10 [a]greement." (Italics omitted.)

The FAC also references the Fast & Furious contracts in various other ways. Specifically, Moritz alleges that "[i]t was always clearly and fully understood between the parties that [Moritz] would receive . . . [Moritz's] customary credit and full financial compensation for producing Hobbs & Shaw," and that a

6

proposal made by Universal after the parties had entered into an oral agreement was contrary "to what Moritz had received on all of the [Fast & Furious] films since approximately 2012 (and had received on many [Fast & Furious] films before that)." (Italics omitted.)

The FAC asserts breach of contract, breach of implied contract, and promissory fraud causes of action and seeks both damages and enforcement of the alleged oral agreement.

### D.    *Appellants' Motion to Compel Arbitration*

Appellants moved to compel arbitration based on the arbitration clauses in the Fast & Furious contracts. Appellants' motion first asked the court to compel arbitration of *the threshold question of arbitrability*: that is, whether the parties' dispute was arbitrable under the arbitration clauses in any of the Fast & Furious contracts. Appellants argued in the alternative that, if the court concluded it had jurisdiction to decide arbitrability, the court should compel arbitration of the parties' dispute in the FAC, because it "related to" one or more of the Fast & Furious contracts.

The court rejected the argument that arbitrability was a question to be decided by an arbitrator. In so doing, the court considered only one potentially applicable arbitration agreement: the agreement reflected in the FF7 contract and made applicable to further "sequels" and "remakes" under the FF8-10 contract. The court disagreed that the question of arbitrability should be decided by the arbitrator, explaining that " [u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator,' " and that "the parties [here] did not clearly and unmistakably provide otherwise." The court observed that the FF8-10 contract was "hardly a model of clarity," and

7

further noted that even if the arbitration agreement *did* clearly delegate the arbitrability issue to the arbitrator, that agreement would not apply to the Hobbs & Shaw dispute in the FAC, because "the parties agree . . . [Hobbs & Shaw] is not a [remake or sequel] within the meaning of the [FF8-10 contract]." (Italics omitted.)

The court therefore considered the merits of appellants' arguments that the FAC dispute fell within the scope of the parties' arbitration agreements in the Fast & Furious contracts, and concluded the dispute was not arbitrable. It therefore denied appellants' motion to compel arbitration.

Appellants timely appealed.

## DISCUSSION

As the basic facts underlying appellants' motion to compel arbitration are undisputed, this appeal presents a purely legal issue, which we review de novo. (See *Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425 ["evaluating an order denying a motion to compel arbitration," "if the court's denial rests solely on a decision of law, then a de novo standard of review is employed"].)

The parties do not dispute that the Federal Arbitration Act (FAA) applies to the arbitration agreements at issue. Nor do we see any basis for concluding otherwise, as the agreements are contained in contracts "involving" interstate commerce (9 U.S.C. § 2; see *Allied-Bruce Terminix Companies, Inc. v. Dobson* (1995) 513 U.S. 265, 276-277) that do not clearly elect some other law to govern arbitrability. (See *Brennan v. Opus Bank* (9th Cir. 2015) 796 F.3d 1125, 1129.)

Section 2 of the FAA provides: "A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." (9 U.S.C. § 2; hereafter sometimes "§ 2.")

Arbitration "is a matter of consent, not coercion." (*Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.* (1989) 489 U.S. 468, 479; see also *Atkinson v. Sinclair Refining Co.* (1962) 370 U.S. 238, 241 ["a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"].) "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." (*AT & T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 648-649.)

Arbitration of a claim is appropriate "only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (*Granite Rock Co. v. Int'l Broth. of Teamsters* (2010) 561 U.S. 287, 297.)

An arbitration agreement is tied to the underlying contract containing it, and applies "only where a dispute has its real source in the contract. The object of an arbitration clause is to implement a contract, not to transcend it." (*Litton Fin. Printing Div. v. NLRB* (1991) 501 U.S. 190, 205 (*Litton*).) No authority permits sending a matter to arbitration simply because the same parties agreed to arbitrate a different matter.

"[W]hether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an ' "issue for judicial determination." ' [Citations.] [W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide." (*Granite Rock Co. v. Int'l Broth. of Teamsters, supra*, 561 U.S. at p. 296; see also *AT & T Technologies, Inc. v. Communications Workers of America, supra*, 475 U.S. at p. 649 [the "question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator"].) "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally

. . . should apply ordinary state-law principles that govern the formation of contracts." (*Cullinane v. Uber Techs., Inc.* (1st Cir. 2018) 893 F.3d 53, 61; see also *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 ["When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts"].)

To form a valid contract there must be a meeting of the minds, i.e., mutual assent. (Code Civ. Proc., § 1281; see Civ. Code, §§ 1550, 1565.) " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts.' " (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc*. (2010) 188 Cal.App.4th 401, 422.)

Here, the parties agreed to arbitrate "any controversy, claim, or dispute arising out of or relating to" the FF6 and FF7 agreements. But the Hobbs & Shaw dispute neither arises from nor relates to the FF6 or FF7 agreements. Although Moritz referenced the agreements in his complaint when explaining the historical background of the Hobbs & Shaw, the mere mention of a contract does not mean the dispute relates to it in any substantive sense. If it did, a party could make any contract relate to a dispute simply by mentioning it. There is no reasonable probability that when the parties agreed to arbitrate any dispute relating to the FF6 and FF7 contracts that they meant every dispute in which a party mentions the contracts, no matter how tangentially.

Appellants nevertheless argue that the arbitration provisions in the FF6 and FF7 agreements apply here because the delegation clauses go on to provide that "[a]ny controversy, claim, or dispute arising out of or relating to . . . *this agreement to arbitrate* . . . shall be" arbitrated (italics added), and such a dispute

10

now exists because they created it by invoking the delegation clause. The argument is without merit.

"[P]arties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." (*Henry Schein, Inc. v. Archer & White Sales, Inc*. (2019) ___U.S.___ [139 S.Ct. 524, 530, 202 L.Ed.2d 480, 487] (*Schein*).) We conclude not only is it not clear and unmistakable here that the parties agreed to delegate arbitrability questions concerning Hobbs & Shaw to an arbitrator, no reasonable person in their position would have understood the F6 and F7 arbitration provisions to require arbitration of any future claim of whatever nature or type, no matter how unrelated to the agreements nor how distant in the future the claim arose.

"For example, if two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship." (*Coors Brewing Co. v. Molson Breweries* (10th Cir. 1995) 51 F.3d 1511, 1516.) When an arbitration provision is "read as standing free from any [underlying] agreement," "absurd results ensue." (*Smith v. Steinkamp* (7th Cir. 2003) 318 F.3d 775, 777.)

Appellants' proffered construction of the delegation clause would not only transcend the purpose and terms of the F6 and F7 agreements, contrary to *Litton, supra*, but would operate to deprive both sides of all future rights to either a jury trial or court resolution of completely unrelated matters arising potentially decades in the future.

11

Appellants rely on *Schein* for the proposition that only an arbitrator can determine whether the arbitration clause should be enforced, and to what extent. We disagree.

Prior to *Schein*, many federal and California state courts considered the merits of the parties' arbitrability arguments to a certain extent in determining who should decide the arbitrability of a dispute under an arbitration agreement governed by the FAA. Namely, if the argument for arbitrability was "wholly groundless," some courts declined to submit the question of arbitrability to the arbitrator, *even when the parties expressly delegated that question to the arbitrator.* (*Schein, supra,* 139 S.Ct. at pp. 528-529; *Smythe v. Uber Technologies, Inc.* (2018) 24 Cal.App.5th 327, 332.) But *Schein* explicitly "reject[ed] th[is] 'wholly groundless' exception" to determinations of arbitrability under the FAA.[2] (*Schein,* at p. 531.)

_____

[2] Before the United States Supreme Court's decision in *Schein*, California courts repeatedly held that the California Arbitration Act (CAA) is "consistent with federal law on the question of who decides disputes over arbitrability," including with respect to the judicially-created "wholly groundless" exception. (See *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 553.) Namely, these cases recognized a "wholly groundless" exception to enforcing an agreement that an arbitrator decide the issue of arbitrability under both the CAA and the FAA. (See, e.g., *ibid.*; *Smythe v. Uber Technologies, Inc., supra,* 24 Cal.App.5th at p. 332 [noting that under the FAA, "[a] delegation clause will be given effect when there is a plausible argument that the arbitration agreement requires the merits of the claim to be arbitrated, and cases where an assertion of arbitrability is 'wholly groundless' are exceptional. [Citation.] California law is consistent with federal law on this question"].) Because the CAA does not apply here, we need not consider whether the CAA will continue to recognize a

The Court further clarified that a party seeking to compel arbitration need show only that "the parties' [valid arbitration] contract delegates the arbitrability question to an arbitrator." (*Id.* at p. 529.) Once it has done so, "a court may not override the contract . . . [and] possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." (*Ibid.*)

But *Schein* presupposes a dispute arising out of the contract or transaction, i.e., some minimal connection between the contract and the dispute. That is so because under the FAA, contractual arbitration clauses are "valid, irrevocable, and enforceable" if they purport to require arbitration of any "controversy thereafter arising out of such contract." (9 U.S.C. § 2.) *Schein* expressly understood that the Act requires enforcement of arbitration clauses with respect to disputes " 'thereafter arising out of such contract.' " (*Schein, supra,* 139 S.Ct. at p. 529 (quoting 9 U.S.C. § 2).) The FAA requires no enforcement of an arbitration provision with respect to disputes unrelated to the contract in which the provision appears. Appellants' argument that an arbitration provision creates a perpetual obligation to arbitrate any conceivable claim that Moritz might ever have against them is plainly inconsistent with the FAA's explicit relatedness requirement.

---

judicially-created "wholly groundless" exception, now that the FAA no longer does so.

## **DISPOSITION**

The order denying the motion to arbitrate is affirmed. Respondents are to recover their costs on appeal.

CERITIFED FOR PUBLICATON

                           CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

14